

I N T H E

# Indiana Supreme Court



FILED
Mar 06 2024, 2:47 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

Supreme Court Case No. 23S-PL-371

Diego Morales, in his official capacity as Indiana Secretary of State, the Indiana Election Commission, and Amanda Lowery, in her official capacity as Jackson County Republican Chair,

*Appellants,*

–v–

John Rust,

*Appellee.*

Argued: February 12, 2024 | Decided: March 6, 2024

Appeal from the Marion Superior Court

No. 49D12-2309-PL-36487

The Honorable Patrick J. Dietrick, Judge

**Opinion by Justice Massa**

Justices Slaughter and Molter concur.

Justice Molter concurs with separate opinion in which Justice Slaughter joins.

Justice Goff dissents with separate opinion in which Chief Justice Rush joins.

**Massa, Justice.**

John Rust seeks the Republican nomination for United States Senator from Indiana in 2024. Concerned he would be denied access to the May primary ballot for failure to comply with state law, he sought preemptive relief in the Marion Superior Court. The law in question, commonly called "the Affiliation Statute," contains objective criteria for determining eligibility to appear on the primary ballot of a major political party[1] and discretion for a party to allow the candidacy regardless of compliance. A judge blocked enforcement of the law, finding it unconstitutional for a variety of reasons, triggering direct appeal to this Court. Focusing primarily on the weighing of First Amendment "rights of association" of both Appellants and Appellee, we first stayed the trial court's ruling on February 15, 2024,[2] and reversed it entirely on February 27, 2024, remanding with an order to enter judgment for Appellants on all claims.[3] Today, we explain why.

Neither the Constitution of the United States nor the Constitution of the State of Indiana mentions political parties, but the Founders were keenly

---

[1] Indiana law defines a "major political party" as follows:

(1) With respect to the state, either of the two (2) parties whose nominees received the highest and second highest number of votes statewide for secretary of state in the last election; or

(2) With respect to a political subdivision, either of the two (2) parties whose nominees received the highest and second highest of number of votes in that political subdivision for secretary of state in that last election.

Ind. Code § 3-5-2-30.

[2] We point out that, while the State originally requested a stay with our Court, it bypassed Appellate Rule 39, which provides that "a motion for stay pending appeal may not be filed . . . unless a motion for stay was filed and denied by the **trial court** . . . ." Ind. Appellate Rule 39(B) (emphasis added). That condition was not satisfied. While we nonetheless stayed the trial court's order, we admonish the State to follow the proper procedures in the future. *See Hardiman v. Cozmanoff*, 4 N.E.3d 1148, 1151 (Ind. 2014) (explaining that appellate courts place special "trust in the trial court to exercise sound discretion" in deciding motions for stay). To be clear, we did **not** grant the State's motion, but instead ordered a stay on our own accord.

[3] The bipartisan State Election Board unanimously upheld challenges to Rust's candidacy on February 27, formally denying him access to the primary ballot.

aware "that splintered parties and unrestrained factionalism may do significant damage to the fabric of government." *Storer v. Brown*, 415 U.S. 724, 736 (1974) (citing FEDERALIST, NO. 10 (Madison)). The United States Supreme Court fifty years ago accordingly found "the State's interest in the stability of its political system" to be "compelling," *id.* at 736, and later recognized that "[a] political party has a First Amendment right to limit its membership as it wishes, and to choose a candidate-selection process that will in its view produce the nominee who best represents its political platform," *N.Y. State Bd. of Elections v. López Torres*, 552 U.S. 196, 202 (2008) (citing *Democratic Party of U.S. v. Wisc. ex rel. La Follette*, 450 U.S. 107, 122 (1981)). The political party seeking the law's enforcement and the State Appellants defending its legitimacy thus wield the First Amendment as a "shield," *López Torres*, 552 U.S. at 203, to deny Rust entry to the ballot.

Appellee Rust, conversely, claims First Amendment associational rights of his own, to wield as a "sword," *id.*, to force his way on the ballot. And in that clash today, the shield checks the sword, as we find the minor requirements of the Affiliation Statute reflect an elegant balancing of First Amendment interests and are thus constitutionally sound.

# Facts and Procedural History

## A. Indiana's Affiliation Statute

The Framers of the United States Constitution "conceived of a Federal Government directly responsible to the people, possessed of direct power over the people, and chosen directly, not by the States, but by the people." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 821 (1995) (citation omitted). This ideal, which was "extant from the beginning of the Republic," *id.*, was constitutionalized in Article I, Section 2, which authorized Members of the House of Representatives to be "chosen every second Year by the People of the several states," U.S. CONST. art. I, § 2, cl. 1. By direct contrast, Article I, Section 3, provided that the "Senate of the United States shall be . . . chosen by the [state] Legislature[s]." *Id.* § 3.

In 1913, the Seventeenth Amendment adjusted that arrangement by amending Article I, Section 3 to allow voters to **directly** vote for senators.

U.S. CONST. amend XVII. Because of its ratification, states established their own primary systems. *López Torres*, 552 U.S. at 206. Indiana enacted the Primary Election Law in 1915, giving Hoosiers the chance to hold primaries for state and federal candidates, including United States senators. Charles Kettleborough, *The Direct Primary in Indiana*, 10 Nat'l Mun. Rev. 166 (1921); *Kelso v. Cook*, 110 N.E. 987, 989 (Ind. 1916).

After a series of modifications, the General Assembly eventually expanded its election laws to provide Hoosiers broad access to become a party-affiliated candidate in a primary election. Before appearing on the party primary ballot, that would-be candidate must satisfy Indiana Code section 3-8-2-7 ("the Affiliation Statute"). The Affiliation Statute requires a would-be candidate to file a declaration of candidacy, Ind. Code § 3-8-2-7, between January 10 and 12:00 p.m. Eastern Standard Time on February 9, 2024, s*ee id*. § 3-8-2-4 (a declaration must be filed not later than noon 88 days and not earlier than 118 days before the primary election).

Additionally, a would-be party-affiliated candidate must establish their **party affiliation** by one of two ways: (A) having voted for the party with which they claim affiliation in the **two** most recent primary elections in which they voted ("Option A"); or (B) filing a certification from their county party chair affirming their membership in the party ("Option B"). *Id*. § 3-8-2-7(a)(4).

A previous iteration of the Affiliation Statute, by contrast, allowed a candidate seeking certification under (a)(4)(A) to qualify so long as he voted for the party with which he claimed affiliation in the last primary election in which he voted. *Id*. § 3-8-2-7(a)(4)(A) (2021). The original version of the statute, effective from 1986 through June 30, 2013, allowed a candidate to establish party affiliation in three ways: (A) voting in the most recent primary held by the party in which the candidate claimed affiliation; (B) the candidate claimed a party affiliation despite never having voted in a primary election; or (C) filing certification from their county party chair affirming their membership in the party. *Id*. § 3-8-2-7(4), *as amended by* Pub. L. No. 194-2013, § 12 (eff. July 1, 2013).

## B. Procedural History

John Rust of Seymour seeks to be a candidate on the May 7, 2024, Republican Party primary ballot for United States Senate. Rust last voted in the Republican primary in 2016. He did not vote in the 2014, 2018, 2020, or 2022 primaries and voted as a Democrat in the 2006, 2008, 2010, and 2012 primaries. Because he last voted in the 2016 Republican primary, Rust could not qualify under Option A of the Affiliation Statute and had to seek party certification under Option B.

In July 2023, Rust met with Jackson County Republican Party Chair Amanda Lowery requesting certification to fulfill Option B. Lowery told Rust she would not certify his party membership because of his voting record. Despite not satisfying either option of the Affiliation Statute, Rust announced his candidacy.

Rust then filed a complaint for declaratory and injunctive relief naming Lowery, the Election Commission, and Secretary of State Morales as Defendants (collectively, "the State"). He also sought a preliminary injunction enjoining the enforcement of the Affiliation Statute, arguing it violated the federal and state constitutions. The State moved to dismiss the complaint under Trial Rule 12(B)(1) and moved to consolidate the hearing on the preliminary injunction motion with a trial on the merits.

The trial court consolidated the motions and after a hearing found the Affiliation Statute unconstitutional. The trial court explained that if the State "imperils a sacred and cherished right of [its] citizens," then it must act "for an articulated compelling and pressing reason, and it[s action] must be exercised in the most transparent and least restrictive and least intrusive ways possible." Appellants' App. Vol. 2, p. 10. The trial court concluded that the 2021 amendment to Indiana Code section 3-8-2-7(a)(4) "fails in this regard." *Id*. Specifically, the trial court found that the Affiliation Statute: (1) violated Rust's First and Fourteenth Amendment rights; (2) raised vagueness and overbreadth concerns; (3) violated the Seventeenth Amendment by improperly taking away rights from voters and giving them to the state legislature and party chairs; (4) violated Rust's Article 1, Section 23 right to equal privileges and immunities; (5)

improperly amended the Indiana Constitution without going through the proper process; and (6) violated the canons of statutory interpretation.

Because the trial court's final judgment declared the Affiliation Statute unconstitutional, we have mandatory and exclusive jurisdiction. Ind. Appellate Rule 4(A)(1)(b). And since this appeal was filed, this Court has received amicus briefs from the Indiana Republican State Committee, and Common Cause Indiana and League of Woman Voters of Indiana.[4]

## Standard of Review

We review statutory and constitutional questions de novo. *City of Hammond v. Herman & Kittle Properties, Inc.*, 119 N.E.3d 70, 78 (Ind. 2019). Here, the Affiliation Statute is cloaked with "the presumption of constitutionality until clearly overcome by a contrary showing." *Horner v. Curry*, 125 N.E.3d 584, 588 (Ind. 2019).

## Discussion and Decision

To begin, we address the threshold issue of whether this matter is justiciable for resolution. The State alleged ripeness and standing as procedural concerns, but conceded during oral argument they were now satisfied. Oral Argument at 3:17–4:10. We agree.

Rust sued the State under our Declaratory Judgment Act, which provides in part: "any person . . . whose rights, status, or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising" under such law. I.C. § 34-14-1-2. While the General Assembly has been silent on what "affected by a statute" entails, this Court in *Holcomb v. Bray* ascribed concrete meaning to that phrase by suggesting it "requires a plaintiff must have standing and that their claims be ripe." 187 N.E.3d 1268, 1285 (Ind. 2022) (citation omitted).

---

[4] We thank Amici for submitting briefs in this case.

**Standing** asks "whether a litigant is entitled to have a court decide the substantive issues of the claims presented," *id.* at 1285 (citing *Solarize Indiana, Inc. v. Southern Gas & Elec. Co.*, 182 N.E.3d 212, 216 (Ind. 2022)), while **ripeness** questions "whether the claim is sufficiently developed to merit judicial review," *id.* at 1285 (citing *Ind. Dep't of Env't Mgmt. v. Chem. Waste Mgmt., Inc.*, 643 N.E.2d 331, 336 (Ind. 1994)).

Standing is a key component of Indiana's tripartite system, which dispels aggregations of power. *Horner*, 125 N.E.3d at 589. Our standing jurisprudence requires plaintiffs to show "their rights are implicated in such a way that they could suffer an injury." *Holcomb*, 187 N.E.3d at 1287. "An injury is personal, direct, and one the plaintiff has suffered or is in the imminent danger of suffering." *Id.* at 1287; *Solarize Indiana*, 182 N.E.3d at 217 (explaining that standing requires "a party showing that they have suffered or were in immediate danger of suffering a direct injury as result of the complained of conduct") (cleaned up). Without a cognizable injury, a court cannot review the merits. *Holcomb*, 187 N.E.3d at 1286.

Claims must also be ripe for adjudication. *See, e.g., Zoercher v. Agler*, 202 Ind. 214, 172 N.E. 186, 189 (1930). As such, claims must not be merely academic or "theoretical," but must reflect a "real or actual controversy, or at least the ripening seeds of such a controversy." *Holcomb*, 187 N.E.3d at 1287 (quoting *Zoercher*, 172 N.E. at 189). The issues, thus, must originate from "actual facts," not "abstract possibilities." *Id.*

Any lingering doubts about standing or ripeness have been quelled because Rust alleges the Affiliation Statute infringes on his constitutional rights. Rust filed his declaration of candidacy on **February 5**, well before the February 9, 2024, at 12:00 p.m., deadline. *See* I.C. § 3-8-2-4(a). He also filed a petition signed by at least 4,500 Hoosier voters, including at least 500 voters from each of Indiana's congressional districts. *Id.* § 3-8-2-8. We therefore conclude that Rust is in "imminent danger of suffering" a real—not theoretical—injury to his rights. *Holcomb*, 187 N.E.3d at 1286. He has standing and his claims are ripe for review.

# I. Rust's First and Fourteenth Amendment challenges fail because the Affiliation Statute imposes a minor, reasonable and nondiscriminatory restriction that advances a litany of important state regulatory interests.

With justiciability established, we turn to the merits. Rust successfully challenged the Affiliation Statute on First and Fourteenth Amendment grounds, arguing it violated his rights of association. Today, we reach the opposite conclusion, and hold the Affiliation Statute survives this constitutional attack.

## A. First Principles of Free Association

We start with first principles of free association. The First Amendment, "applicable to the States through the Fourteenth Amendment," *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), prohibits the government from "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances," U.S. CONST. amend. I. The United States Supreme Court has long embraced the axiom that "implicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).

At its core, the First Amendment safeguards "the freedom to join together in furtherance of common political beliefs." *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214 (1986). This freedom, which implicitly flows from the constitutional text, "presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only." *La Follette*, 450 U.S. at 122. If liberty exists, differences exist; and where differences exist, factions and groups emerge. *See* FEDERALIST, NO. 10 (Madison) ("As long as the reason of man continues to be infallible, and he is at liberty to exercise it, different opinions will be formed."). Individuals have diverse views, preferences, and commitments. *See Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983) (explaining that free association involves "an inseparable aspect of the 'liberty' assured by the

Due Process Clause of the Fourteenth Amendment"). Protected association, therefore, plays an instrumental role in carving out space for the advancement of "a wide variety of political, social, economic, educational, religious, and cultural ends." *Am. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373 (2021) (quoting *Jaycees*, 468 U.S. at 622).

But the implication of the right to associate is the "corollary" right **not** to associate. *Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000). Without this feature, the purpose of free association would be undermined. Both rights—to associate and not associate—are two sides of the same coin. Otherwise, free association "would prove an empty guarantee if associations could not limit control over their decisions to those who share the interests and persuasions that underlie the association's being." *La Follette*, 450 U.S. at 122 n.22 (cleaned up). Our First Amendment jurisprudence consecrates a "special place" for "the processes by which a political party 'selects a standard bearer who best represents the party's ideologies and preferences.'" *Jones*, 530 U.S. at 575 (quoting *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 224 (1989)). Why? Because the party's nominee serves as its "ambassador to the general electorate," tasked with winning votes. *Jones*, 530 U.S. at 575. "In no area is the political association's right to exclude more important than in the process of selecting its nominee," as a party sets forth the criteria and vision for its agenda. *Id.* Indeed, the "moment of choosing the party's nominee" for office, *Jones*, 530 U.S. at 575, represents a pivotal stage when principle becomes practice—"the crucial juncture at which the appeal to common principles may be translated into concerted action, and hence to political power in the community," *Tashjian*, 479 U.S. at 216.

Against this backdrop, the core First Amendment question before us today is: **Who decides**? That is, who decides whether Rust can run as a Republican on the 2024 primary ballot for United States Senate in Indiana? Himself? Or the Republican Party? The Affiliation Statute says both: Rust decides if he votes in two primaries; the party decides if he does not.

We find solid footing in the broad principle pronounced in *López Torres*: "A political party has a First Amendment right to **limit** its membership as it wishes, and to **choose** a candidate-selection that will in

its view produce the nominee who **best represents** its political platform." 552 U.S. at 202 (emphasis added). Two ideas merit brief explanation. First, limitation of membership suggests that some individuals will **not** represent the party and its platform. Thus, the party has a right to restrict association. This point hardly needs dissertation: a northern Democrat who opposed Lyndon Johnson's landmark civil rights law would likely have been unwelcomed in his party in 1968; a Republican opposing Ronald Reagan's tax reforms could likewise be shunned decades later, as parties would have the right to limit association with critics.

Second, a party's choice over the candidate-selection process allows it to work within the real-world constraint that differences exist among candidates. The Founders rightfully embraced in the Declaration of Independence the notion that "all men are created equal." But that premise of equality does not ensure that each candidate will be equal in **every** respect. Some are better equipped for a party nomination than others. This could stem from a variation in a candidate's views, charisma, experience, or timing.

And that brings us to the fundamental purpose of candidate-selection: it allows parties to decide who would be the **best** "ambassador," *Jones*, 530 U.S. at 575, of its "ideologies and preferences." *Id.* (cleaned up). History shows that party primaries were not the only valid method of selection. Instead, selection by "smoke-filled rooms" dictated by party bosses was constitutionally permissible. *López Torres*, 552 U.S. at 206. Such a method was not constitutionally infirm, but part-and-parcel of free association. *Id.* And to be sure, this method "has never been thought unconstitutional," even though delegates were selected by party caucuses. *Id.*

Indiana's history confirms its own vacillation in candidate-selection. In response to the Seventeenth Amendment, Indiana enacted the Primary Election Law in **1915**, establishing candidate nominations by party primary election for both state and federal candidates. Charles Kettleborough, *Direct Primary in Indiana* at 166. This statewide requirement applied to all parties casting over ten percent of the total vote in the preceding general election. J.F. Connell, *Indiana Primary Laws*, 18 Ind. Mag. Hist. 224, 230 (1922). In **1929**, however, Indiana abandoned

primaries and returned to nominating candidates for United States Senate and Governor at state political party conventions. *Id.* Finally, in 1975, Indiana law was amended to return once again to primary selection for these candidates. I.C. § 3-1-10-3 (1975). In short, these alterations in candidate selection over sixty years reflect different value-laden **policy** choices by the political branches about how much choice the State was willing extend to parties, consistent with the First Amendment's broad guarantee of associational rights.

To be sure, a party's associational rights are **not** infinite and without limitation. For example, if states give a party a seat at the table in "the election process," the party's rights are constitutionally "circumscribed." *López Torres*, 552 U.S. at 203. In such an event, if a party committed a racially discriminatory act, it could come within state action and thus result in a Fifteenth Amendment violation. *Id.* at 798. On the flip side, the State, having given a party a seat at the table, would also have "a legitimate . . . interest in ensuring the fairness of the party's nominating process," and thus could define "what the process must be." *Id.* Of course, it is "too plain for argument," *Am. Party of Tex. v. White*, 415 U.S. 767, 781 (1974), that states may enact procedures and decide the "party use of primaries or conventions to select nominees who appear on the general-election ballot," *López Torres*, 552 U.S. at 203 (citing *White*, 415 U.S. at 781).

This principle of free association was explained in *López Torres*. In that case, the United States Supreme Court confronted a 1921 New York election law that "required parties to select their candidates for the Supreme Court [the trial court of general jurisdiction in New York] by a convention composed of delegates elected by party members." *Id.* at 200 (citation omitted). Under that law, the nominees chosen at the party conventions "appear[ed] automatically on the general-election ballot." *Id.* at 201. López Torres had been elected to "a court of more limited jurisdiction" in 1992 with the support of the Democratic Party, but fell out of favor with party leaders over her resistance to their patronage hiring demands. *Id.* at 201 According to López Torres, her continued resistance led to the local party opposing her unsuccessful candidacy at the Supreme Court nominating conventions in 1997, 2002, and 2003, respectively. *Id.* She later brought suit—along with other candidates who failed to secure

party nominations—against the New York Board of Elections, arguing that this law "burdened the rights of challengers seeking to run against candidates favored by the party leadership," and as a result "deprived voters and candidates of their rights to gain access to the ballot and to associate in choosing their party's candidates." *Id.*

The Supreme Court rejected this novel argument on arrival. Justice Scalia, writing for the Court, reasoned these challengers were "in no position to rely on the right that the First Amendment confers on political parties to structure their internal party processes and to select the candidate of the party's choosing." *Id.* at 203. And this is where the "shield" and "sword" imagery came to life: Democratic and Republican parties in New York both intervened to defend the election law and thus use the First Amendment as a "shield" of associational protection. *Id.* López Torres, by contrast, employed the First Amendment as a "sword" as an attempt to gain entry into the party to obtain "a certain degree of influence" within it. *Id.* She argued that use of the sword was needed to ensure that she and others would have a "fair chance" in prevailing in their primary candidate-selection process. *Id.* at 203–04. But this implausible and strained reading of the First Amendment was unmoored from federal precedent authorizing states to impose reasonable limitations on voting. *Id.* at 204; *see, e.g., Jenness v. Fortson*, 403 U.S. 431, 442 (1971) (recognizing that states may require a person to show "a significant modicum of support" before giving them access to the general-election ballot); *Norman v. Reed*, 502 U.S. 279, 295 (1992) (approving rule of 25,000 signatures, or two percent of the electorate); *White*, 415 U.S. at 783 (approving condition of one percent of the vote cast for Governor in preceding general election, which was around 22,000 signatures).

The Court rejected this request to ensure candidates have a "fair shot," because opening the doors to an "unpredictable theater of election jurisprudence" would require constitutionalizing a policy preference about candidate selection. *López Torres*, 552 U.S. at 206–07. While New York could make a policy decision about whether its candidate-selection regime that dated to 1921 was still "desirable," the First Amendment did not **compel** that outcome. *Id.* Properly understood, the Constitution vests authority in the political branches to ratify those policy decisions.

## B. Application of *Anderson-Burdick* Framework

With the First Amendment principles established, we turn to the *Anderson-Burdick* framework to evaluate whether the Affiliation Statute survives Rust's First Amendment challenges. Under this standard, we assess the competing rights of both parties and candidates. Based on our application of this standard, the Affiliation Statute passes constitutional muster, despite Rust's insistence to the contrary.

To start, we acknowledge a key distinction between the rights of **voters** and the rights of **candidates**. "[T]he political franchise of voting . . . is regarded as a fundamental political right, because preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). By contrast, the rights of candidates is less defined and has not been awarded a fundamental status. *See Bullock v. Carter*, 405 U.S. 134, 142–43 (1972) ("the Court has not heretofore attached such fundamental status to candidacy as to invoke a rigorous standard of review" but "laws that affect candidates always have at least some theoretical, correlative effect on voters"); *see also Clements v. Fashing*, 457 U.S. 957, 963 (1982) (explaining there is no fundamental right for a candidate to run for office). In this arena, precedent affording protection for candidacy "can be best described as a legal morass." *Randall v. Scott*, 610 F.3d 701, 710 (11th Cir. 2010). We can thus confidently say that Rust does **not** have a fundamental right to run for United States Senate in Indiana, let alone as "the Republican Party's nominee" for that place on the ballot. Ind. Republican State Comm. Amicus Br. at 9.

But just because he lacks a fundamental right to run for United States Senate as **the** Republican nominee does not mean he lacks a right to run as **a** candidate for United States Senate. *Id.* The First Amendment generally protects the rights of political parties **and** the rights of citizens to participate in the electoral system. *See Norman,* 502 U.S. at 288 (identifying the "constitutional interest of like-minded voters to gather in pursuit of common political ends"). Thus, we must still determine whether the Affiliation Statute infringes Rust's First Amendment rights.

We look to *Anderson-Burdick* for instruction. *See Tully v. Okeson*, 977 F.3d 608, 615 (7th Cir. 2020) (explaining that the *Anderson-Burdick* "test applies to **all** First and Fourteenth Amendment challenges to state election

laws.") (emphasis in original). This framework descends from two Supreme Court cases, *Anderson v. Celebrezze*, 460 U.S. 780, and *Burdick v. Takushi*, 504 U.S. 428. The balancing test from *Anderson* requires three inquiries: First, the Court must "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments." 460 U.S. at 789. Second, the Court "must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed [by the law]." *Id.* Third, in weighing the rights burdened and the state's interests, the Court "also must consider the extent to which those [state] interests make it necessary to burden the plaintiff's rights." *Id. Burdick* later recognized two applicable standards: when the burden on ballot access is **severe**, the restriction triggers strict scrutiny and must be narrowly tailored to advance a compelling state interest. 504 U.S. at 434. But if the burden is "**reasonable**" and "**nondiscriminatory**," the restriction will survive constitutional attack if the state can identify and put forth "important regulatory interests" to justify it. *Id.* (emphasis added). Under the more deferential *Anderson-Burdick* standard, the regulation still "must be justified by relevant legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (cleaned up).

The trial court, in reviewing this challenge, concluded there was (1) "no compelling or even rational government interest being served here," and (2) the statute was not "tailored" to meet the State's purported interests. Appellants' App. Vol. 2, p. 20. We disagree. Because the Affiliation Statute imposes a minor, reasonable and nondiscriminatory restriction on Rust's rights, justified by the State's catalogue of legitimate interests, it survives this attack under the *Anderson-Burdick* standard.[5]

---

[5] Because we resolve this challenge under the *Anderson-Burdick* standard, we need not analyze this challenge under strict scrutiny. Rust did not directly assert that the Affiliation Statute was not reasonable and instead assumes the more exacting strict scrutiny applies. We disagree.

1. **The Affiliation Statute imposes a minor, reasonable and nondiscriminatory limitation on Rust's associational rights.**

**First**, the Affiliation Statute imposes a reasonable and nondiscriminatory restriction on Rust's right to be on the **primary** election ballot. At most, this restriction is a minor impediment, satisfied by simply voting in the last two primaries (or less, actually, so long as in the last two primaries in which Rust voted—**whenever** they were held—he requested a Republican Party ballot). We do not find this modest objective criterion for demonstrating party bona fides to be a significant burden.

Moreover, to reiterate, Rust does not have a fundamental right to run for United States Senate as the Republican nominee. *See Clements*, 457 U.S. at 963. But the Affiliation Statute does not foreclose his opportunity to run as a candidate for United States Senate anyway. He still enjoys a statutory right to appear on the **general-election ballot** as an independent, Libertarian, or write-in candidate, where Hoosiers can still vote for him. I.C. §§ 3-8-4-10(b); 3-8-6-3; 3-8-2-2.5(a). True, Rust cannot run on the Republican primary ballot—admittedly, his "first choice"—but he can still run as an independent, for example, and "tout his Republican virtues, tell voters he supports Republicans, put up yard signs to that effect, and run on a platform identical to any political party." *Hero v. Lake County Election Board*, 42 F.4th 768, 776 (7th Cir. 2022). Still, Rust argued that even if he could "run as an independent or write-in candidate, a severe restriction of his right to freely associate would [still] exist." Appellee's Br. at 32. We disagree. Even though independents or write-in candidates may not have the greatest likelihood of electoral success, *see Anderson*, 460 U.S. at 799 n.26 (explaining the limitations of a write-in candidacy), the Supreme Court has rejected similar fairness arguments requesting that the First Amendment's free association jurisprudence be calibrated to maximize the electoral chances of candidates for office, *see López Torres*, 552 U.S. at 205 (pointing out that "none of our cases" recognize a "constitutional right to have a 'fair shot' at winning the party's nomination").

Though ballot access laws can impose burdens on the "right of individuals to associate for the advancement of political beliefs," even restrictions on general elections do not automatically trigger strict

scrutiny. *Navarro v. Neal*, 716 F.3d 425, 430 (7th Cir. 2013) (quoting *William v. Rhoades*, 393 U.S. 23, 30 (1968)). The Seventh Circuit in *Navarro*, for example, upheld an Illinois law requiring candidates for state legislature to secure 500 to 1,000 signatures to appear on the general-election ballot, reasoning that this restriction was not severe and therefore qualified as minor. 716 F.3d at 428–30; *see also Burdick*, 504 U.S. at 434 (applying a more lenient standard to Hawaii's prohibition on write-in voting in primary and general elections); *Clingman v. Beaver*, 544 U.S. 581, 593 (2005) (applying a more lenient standard to Oklahoma's semi-closed primary system that allowed independent voters but blocked other parties' members from voting in the Libertarian Party's primary election).

At most, the Affiliation Statute is a minor restriction. It simply governs the procedures to access the party's **primary** ballot by requiring Rust to establish sufficient party affiliation by showing (1) he has an adequate primary voting record with the party, or (2) he has attached a written certification of party membership from the county party chair to his declaration of candidacy. I.C. § 3-8-2-7(a)(4). Unlike *Navarro*, 716 F.3d at 428–30, none of these conditions impact Rust's access to the general-election ballot. At bottom, he can still run his campaign, express his views, put forth his agenda, and appear on the general-election ballot in November. *See Anderson*, 460 U.S. at 788 ("[A]n election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying-point for like-minded citizens."). And Hoosiers can still vote for him. Thus, we are satisfied this restriction is indeed minor, as that term has been defined in election law challenges.

Our conclusion finds refuge and support in the Seventh Circuit's decision in *Hero*. In that case, Joseph Hero "voted in Republican primaries for decades, and even ran for office as a Republican with occasional success." 42 F.4th at 770. After a local policy disagreement about his town's use of eminent domain to seize property from low-income residents, Hero supported a group of independent candidates running for town council. *Id.* In response, the local Republican Party deprived Hero of his ability to run for reelection as precinct committeeman and delegate to the Republican State Convention. Further, the State Republican Party took

a bolder step in that direction and banned him for **ten years** from "seeking elected office in Indiana as a Republican." *Id.* at 770–71.

Unmoved, Hero attempted to appear as the Republican candidate for town council in the 2019 election. *Id.* at 771. He satisfied all requirements under Indiana law,[6] but the local party objected and challenged his candidacy. *Id.* The Lake County Election Board sustained the challenge and removed Hero from the Republican primary ballot. *Id.* On appeal, the Seventh Circuit held that the Election Board "did not violate Hero's First and Fourteenth Amendment rights" because its decision to strike his name from the primary ballot was simply a "minor restriction" on his rights, as Hero could still access the general-election ballot. *Id.* at 776.

In short, *Hero* reinforces our conclusion that the Affiliation Statute imposes a minor, reasonable and nondiscriminatory restriction on Rust's rights as a candidate. Applying the *Anderson-Burdick* framework, *Hero* determined that enforcement of a **ten-year ban** on affiliation—"a patently more severe restriction" than the one here, Ind. Republican State Comm. Amicus Br. at 16, was minor given Hero's alternative **access** to the general-election ballot. Like *Hero*, Rust, too, has other routes to the general-election ballot, I.C. §§ 3-8-4-10(b); 3-8-6-3; 3-8-2-2.5(a), even if they are not his "first option," *Hero*, 42 F.4th at 776. We are thus satisfied *Hero* supports our conclusion today that the Affiliation Statute imposes a minor restriction triggering *Anderson-Burdick*, applying less than strict scrutiny.

Rust successfully argued below that *Hero* could be distinguished for two reasons. First, *Hero* did not "involve a challenge to, or the interpretation of," the Affiliation Statute. Appellants' App. Vol. 2, p. 32. Second, *Hero* involved internal banishment by the Republican Party, whereas Rust has not been banned by the GOP. Both are unpersuasive.

---

[6] At the time of *Hero*, the previous iteration of the Affiliation Statute provided that a candidate of a major political party could file "a declaration of candidacy" for a party if either he voted in the last primary election, or the county chairman certified that the candidate is a member of the political party. 42 F.4th at 771 (citation omitted). As explained, the law has since been amended to require voting in **two** primary elections. I.C. § 3-8-2-7(a)(4).

True, *Hero* did not challenge the constitutionality of the Affiliation Statute. But Hero pressed the **same** First and Fourteenth Amendment associational rights to access the Republican primary ballot, *see* 42 F.4th at 771, which also undergird Rust's challenge. And equally true: the ten-year ban in *Hero* originated with the party, *id.*, whereas Rust feared rejection because he failed to satisfy statutory requirements. But the **final** decision to remove Hero from the ballot was from a state actor—the Lake County Election Board, which enforced the party's First Amendment rights. *Id.*

While Rust urges we focus narrowly on the thin distinction between party and state action, *Hero* explained more broadly that a political party has a First Amendment right to exclude those "with whom the party does not wish to affiliate" and that a state, in turn, can "protect the First Amendment rights of a political party" by allowing it to "restrict its standard bearers to members in good standing." 42 F.4th at 776–77. *Hero* thus stands for a larger First Amendment principle: a political party may **exclude** candidates from their ballot, **even if** they satisfy the Affiliation Statute. *Id.* at 771; *see also* Ind. Republican State Comm. Amicus Br. at 17.

## 2. The State has important interests supporting this minor restriction on Rust's access to the primary-election ballot.

And this brings us to our **second** point: The State has a list of important regulatory interests in protecting a party's associational rights that justify this minor, reasonable and nondiscriminatory restriction.

But before we survey the range of state interests, we again acknowledge a first principle: **political parties** have legitimate First Amendment interests in choosing—and excluding—their members and leaders. "Political parties enjoy these associational rights like any other organization." *Hero*, 42 F.4th at 776. Its "determination . . . of the structure which best allows it to pursue its political goals, is protected by the Constitution." *Tashjian*, 479 U.S. at 224. The Supreme Court has "vigorously affirmed," and specifically recognized, this "special place" reserved by the First Amendment. *Jones*, 530 U.S. at 575. A party's associational rights "presuppose[] the freedom to identify those who constitute the association, and to limit the association to those people." *Jones*, 530 U.S. at 567–68 (citing *La Follette*, 450 U.S. at 122). Free association

also generally "encompasses a political party's decision about the . . . process for electing its leaders." *Eu*, 489 U.S. at 229. The Supreme Court has also embraced—"with increasing firmness"—the view that "the First Amendment guarantees a political party **great leeway** in governing its own affairs." *Maslow v. Bd. of Election in N.Y.C.*, 658 F.3d at 291, 296 (2d Cir. 2011) (emphasis added). A party thus has an indispensable interest in protecting itself against "unaffiliated" people who "may seriously distort [its] collective decisions," and thus encroach its "essential functions." *Hero*, 42 F.4th at 776 (quoting *La Follette*, 450 U.S. at 122). Rightfully so.

Of course, these rights belong to the party, but **states** also have a legitimate interest in safeguarding parties from forced inclusion of unwanted members and candidates. *See Hero*, 42 F.4th at 776 ("The state has an interest in protecting a party's right to determine its own membership and limit its candidates to those party members."). Allowing an unwanted individual to wield a "sword" to gain access into a party, *López Torres*, 552 U.S. at 203, would invade "the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints," *Hero*, 42 F.4th at 776 (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (1984)). While a party may use the First Amendment as a "shield," *López Torres*, 552 U.S. at 203, to protect itself from "intrusion by those with adverse political principles," *La Follette*, 450 U.S. at 122, states may also further "protect the First Amendment rights of a political party," as the Election Board did in *Hero*, "by allowing the Republican Party to determine its membership and restrict its standard bearers," 42 F.4th at 777–78.

This principle—that the Constitution allows states to guard a political party's preferences—finds support elsewhere. Two federal circuit opinions from the Eleventh Circuit, which both concerned a party's effort to exclude an odious candidate from its primary ballot, provide illustration. In *Duke v. Cleland*, 954 F.2d 1526 (11th Cir. 1992), the Eleventh Circuit applied a "reasonable restriction standard" to find that, while David Duke, a former Klansman, had satisfied the statutory requirements for ballot access, the Republican committee had the First Amendment right to keep him off, and Georgia "has an interest in maintaining the autonomy of political parties," because the Republican Party enjoys "a

constitutionally protected right of freedom of association." *Id.* at 1531–32. Four years later in *Duke v. Massey*, 87 F.3d 1226 (11th Cir. 1996), the Eleventh Circuit again denied Duke relief, but this time it applied strict scrutiny. *Id.* at 1234. The court concluded that the "state has a compelling interest in protecting political parties' right to define their membership." *Id. Hero* thus does not find itself on an island of its own jurisprudence.

States also have an important interest in sustaining the **identifiability** of political parties. The integrity and legitimacy of a political party "depend[] upon its ability to place before voters, under the party insignia, a list of candidates for office who stand for those tenets concerning government that the organization is supposed to represent." *State ex rel. Garn v. Bd. of Election Comm'rs of Marshall Cnty.*, 78 N.E. 1016, 1018 (Ind. 1906). Thus, party identifiability embodies "the highest importance to the electors, to the end that they might not be misled into indorsing principles in form to which they were opposed in fact." *Id.*

States also have a "strong interest" in fostering the health and "**stability** of their political systems." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 366 (1997) (emphasis added). As such, states may "enact reasonable election regulations that may, in practice, favor the traditional two-party system and that temper the destabilizing effects of party-splintering and excessive factionalism." *Id.* at 367 (citation omitted). The strength and vitality of "established parties," *Elrod v. Burns*, 427 U.S. 347, 383 (Powell, J., dissenting), present voters "with understandable choices and the winner in the general election with sufficient support to govern effectively," *Storer*, 415 U.S. at 735. By contrast, "splintered parties and unrestrained factionalism" could impose "significant damage to the fabric of government." *Id.* "[T]he importance of political parties [is] self-evident," serving "a variety of substantial government interests," including effective implementation of programs and policies, accountability, and identifiability for voters in down ballot, lower profile races. *Branti v. Finkel*, 445 U.S. 507, 528 (1980) (Powell, J., dissenting); *id.* at 531 (explaining that "[v]oters with little information about individuals seeking office traditionally have relied upon party affiliation as a guide to choosing among candidates," but a "decline in party stability" has left

them "less able to blame or credit a party for the performance of" its officials).[7]

On a more general level, states have other essential interests in cabining ballot access rights to protect the **integrity of the election process**. The Supreme Court has affirmed that states have important regulatory interests in imposing ballot access requirements to prevent ballot overcrowding, voter confusion, and election fraud. *Storer*, 415 U.S. at 732–33. In short, states have a robust "interest in having orderly, fair, and honest elections," rather than allowing circus-level "chaos" and confusion. *Storer*, 415 U.S. at 730. Because the state has an interest in preserving the integrity of its election process, it may pass laws that "promote the integrity of primary elections." *Eu*, 489 U.S. at 231; *see also Rosario v. Rockefeller*, 410 U.S. 752, 761 (1973) (states may impose waiting periods before voters change party registration and participate in another party primary; *Bullock*, 405 U.S. at 145 (states may also prevent "frivolous or fraudulent candidacies"); *Norman*, 502 U.S. at 290 (states have an interest in thwarting "misrepresentation" and electoral confusion).

Here, the State put forth several "precise interests" to justify the Affiliation Statute's restriction on primary ballot access. *Anderson*, 460 U.S. at 789. These interests included "protecting a political party's right to determine its own membership," Tr. at 154, and preventing "voter confusion by preserving party identifiability, avoiding ballot overcrowding and frivolous candidacies, and maintaining order, rather than chaos, in Indiana's primary and general elections," Appellants' Br. at 27. With these interests in mind, we conclude the State has several important interests supporting the Affiliation Statute, which imposes a minor, reasonable and nondiscriminatory limitation on Rust's rights.

---

[7] While these sentiments appeared in dissents from opinions holding wholesale patronage firings unconstitutional, that context makes them no less relevant and persuasive today. Indeed, the *Elrod* and *Branti* dissents were prescient in predicting today's political environment where celebrity can trump organization. It is simply historical fact that "smoke-filled" convention halls when parties were stronger gave us Lincoln, the Roosevelts, Truman, and Eisenhower, to name several, though causation and correlation can always be debated.

The Affiliation Statute provides a reasonable balancing to access the primary ballot: **Option A** provides that a candidate, like Rust, may establish sufficient association with a major political party if his two most recent primary votes in Indiana were in the party's primary. I.C. § 3-8-2-7(a)(4)(A). This option affords **candidates** control over affiliation through primary election voting. Here, Rust had that choice, but did not exercise it. He voted in the Republican primary in 2016, and yet he did not vote in the 2014, 2018, 2020, or 2022 primaries. Appellants' App. Vol. 2, pp. 57–59. Thus, he failed to exercise **his** rights to affiliate with the Republican Party under the Affiliation Statute. By contrast, **Option B** provides Rust a potential safe harbor by allowing him to request certification by his county party chair. I.C. § 3-8-2-7(a)(4)(B). But his request for affiliation with the Republican Party is cabined by the county party's discretion, which reflects the **party's** right to decide whether to use its rights as a "shield," *López Torres*, 552 U.S. at 203, against Rust if it desires not to be affiliated with him. *See infra* Section II.E. In short, Option B advances the party's associational right to "limit" candidates, *Hero*, 42 F.4th at 776, which in turn protects its identifiability, *Garn*, 78 N.E. at 1018, and ensures the enduring "stability" of the political system, *Timmons*, 520 U.S. at 366.

Both options reasonably balance the rights of candidates and parties consistent with the Constitution. As a matter of first principles, the First Amendment does not give Rust a license to "fight freestyle" to access the Republican primary ballot, while requiring the Party to "follow Marquis of Queensberry rules." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 392 (1992). This statute embraces that principle and further ensures an equal fight.

The dissent rejects this equal fight by implicitly appealing to policy arguments about fairness.[8] At first glance, our disagreement may seem to turn on whether the Affiliation Statute imposes a minor or severe burden under *Anderson-Burdick*, which triggers the level of scrutiny. But upon closer reflection, this conflict is really a clash about the judicial role.

---

[8] We assign the election policy choices of Illinois and New Jersey, for example, zero weight in our constitutional analysis. *Post*, at 7 n.6. (opinion of Goff, J.).

The fundamental question today is who decides whether Rust should be on the Republican primary ballot for United States Senate. The plain text of the Affiliation Statute is clear: Rust decides to be on the primary ballot if he votes in two Republican primaries; the party decides if he does not. I.C. § 3-8-2-7(a)(4). The facts are equally clear: Rust did not vote in the required primaries, nor did Chairperson Lowery certify him. Thus, based on the terms of the statute, Rust should not be on the ballot—full stop.

So, why are we here? Because Rust believes the Affiliation Statute is unconstitutional under the First and Fourteenth Amendments (though it is unclear if he brings a "facial" or "as-applied" challenge). The dissent sympathizes, and raps Indiana for imposing "some of the highest hurdles for primary-ballot access in the nation," while observing that "the General Assembly recently amended [the] election code to make it even harder for potential candidates to add their names to the primary ballot." *Post*, at 6 (opinion of Goff, J.). The dissent also judges the State for offering "**no meaningful opportunity** for Rust to exercise his associational rights as a candidate or a voter." *Id.* at 10 (emphasis added).[9] If we are talking about Rust as a **candidate**, the State could abolish its primary system altogether and provide no opportunity for Rust to exercise his associational rights if it so desired.[10] Since the selection of candidates through "smoke-filled rooms" has **never** been viewed as unconstitutional, *López Torres*, 552 U.S. at 206, the argument is unpersuasive, especially since Rust can exercise his rights on the general-election ballot this fall. But even if we are talking

---

[9] Rust brings this claim as both a candidate and as a voter. App. Vol. 2, p. 37. But precedent confirms the rights of voters and rights of candidates are distinct and thus do not share the same status. *Compare Yick Wo*, 118 U.S. at 370 (describing voting as "a fundamental political right"), *with Bullock*, 405 U.S. at 142–43 (explaining that a "fundamental status to candidacy" has not been "attached" to such a right). Rust presents **no** meaningful line of distinction here—he baldly asserts his rights as a candidate and voter without demarcation.

[10] Rust's counsel acknowledged during oral argument that abolishing the primary selection of candidates in Indiana would be constitutionally permissible. Oral Argument at 19:26–19:40.

about Rust's rights as a **voter**,[11] the Supreme Court has typically reviewed these restrictions "and their reasonably foreseeable impact on **voters generally**," not on the individual burden. *Crawford*, 553 U.S. at 206 (Scalia, J., concurring in the judgment) (emphasis in original). *Burdick*, for example, concluded that the Hawaii laws at issue "impose[d] only a limited burden on voters' rights to make free choices and to associate politically through the vote." 504 U.S. at 439. But *Burdick* did not review whether the restrictions had a severe effect on Burdick's right to vote under his personal circumstances. *See id.* at 436–37. In fact, that view was embraced by the *Burdick* dissenters who would have applied strict scrutiny to the laws because of their impact on "**some voters**." *Id.* at 446 (Kennedy, J., dissenting) (emphasis added); *see also id.* at 448 ("The majority's analysis ignores the inevitable and significant write-in ban imposes on some individual voters . . . ."). But properly understood, precedent "refute[s] the view that individual impacts are relevant to determining the severity of the burden it imposes." *Crawford*, 553 U.S. at 206 (Scalia, J., concurring in the judgment); *see also Clingman*, 544 U.S. at 590–91 (examining voting burdens generally rather than individually).

We are acutely aware of our limited constitutional role as judges and thus avoid any "pretense of knowledge" about what is best for Hoosiers as a matter of policy when it comes to primary elections.[12] Out of this posture of judicial humility, we presume the constitutionality of statutes "until clearly overcome by a contrary showing." *Horner*, 125 N.E.3d at 588. At the same time, we also recognize our power of judicial review—that it is "emphatically the province and duty of the judicial department to **say**

---

[11] Rust brought this claim as an individual voter because he "seeks to cast **his vote** effectively." App. Vol. 2, p. 37 (emphasis added). But the dissent extrapolates from this complaint that the burden is not simply about Rust's rights as an individual voter, but also about "his **prospective supporters'** rights." *Post*, at 10 (opinion of Goff, J.) (emphasis added).

[12] F.A. Hayek expressed this sentiment in his famous "The Pretence of Knowledge" 1974 Nobel Lecture: "To act on the belief that we possess the knowledge and the power which enable us to shape the processes of society entirely to our liking, knowledge which in fact we do not possess, is likely to make us do much harm." Friedrich August von Hayek, *The Pretence of Knowledge*, Nobel Memorial Lecture (Dec. 11, 1974), in 79 Am. Econ. Rev. 3, 7 (1989).

**what the law is**." *Marbury v. Madison*, 1 Cranch 137, 177 (1803) (emphasis added); *see also* FEDERALIST, NO. 78 (Hamilton) ("The interpretation of the laws is the proper and peculiar province of the courts."). As such, civics teaches that the legislature makes the law and courts interpret law as written. But the dissent would collapse the judicial and legislative functions and flout the separation of powers by announcing its **own** policy preference: "Primaries are not meant to be opportunities for party leaders to crown their favored candidates—and certainly not in uncontested ballots." *Post*, at 2 (opinion of Goff, J.). But the First Amendment says nothing of the sort, and the Supreme Court has never embraced this policy and transformed it into a formal rule or standard for constitutional law. *See López Torres*, 552 U.S. at 205–06 (explaining that determining a candidate's "fair shot" is "hardly a manageable constitutional question for judges—especially for judges in our legal system, where traditional electoral practices give no hint or even the existence, much less the content, of [such] a constitutional requirement"). Thus, the dissent's position is untethered from the First Amendment.

Elsewhere, the dissent points to the "lack of competition" in elections, which "has resulted in extremely low voter turnout in recent years." *Post*, at 5–6 (opinion of Goff, J.). In highlighting this concern, the dissent shares data about the "average turnout rate for eligible voters at primary elections" in Indiana. *Id.* at 6. Admittedly, low voter turnout presents a legitimate concern for Hoosiers—a concern that all members of this Court share. At any rate, this problem is best addressed in the legislature, where elected officials can debate and discuss the efficacy and desirability of policies affecting voter turnout. Courts should not be drawn into the vortex of hotly-contested social and political disputes, which they are ill-equipped to handle, due to limited institutional competence in evaluating

such information and rendering judgments.[13] Simply put, the legislature is in the best position to "weigh the costs and benefits" of a given ballot restriction and voter turnout. *Crawford*, 553 U.S. at 208 (Scalia, J., concurring in the judgment). Courts, in contrast, should stay in their lane and not make broad, values-based pronouncements about election policy. The Constitution did not assign us that job. As always, the legislature can amend its primary-selection method. *Post*, at 2–6 (opinion of Goff, J.). "But to say that the State can require this is a far cry from saying that the Constitution demands it." *López Torres*, 552 U.S. at 206. It does not.

The dissent also expresses policy preferences when it generally concludes that the Affiliation Statute fails to serve the State's interests because "[t]here's no potential for ballot overcrowding," *post*, at 13 (opinion of Goff, J.), and "likewise no potential for party raiding or a frivolous candidacy," *id.* at 14. In acknowledging the State has "a legitimate interest in seeing that ballots are not encumbered by the names of candidates with no substantial support," *id.* at 13, the dissent contends that the Petition Statute, Indiana Code § 3-8-2-8, "**adequately serves**" the State's interests in preventing ballot overcrowding, *id.* (emphasis added). Two points stand out. First, is the dissent implying the Affiliation Statute can **never** serve the State's interest in preventing ballot overcrowding? Or is it concluding that the Petition Statute is simply **better** at serving the State's interests? Either way, both explanations involve a policy assessment of the Affiliation Statute. *Cf. Munro v. Socialist Workers Party*, 479 U.S. 189, 195–96 (1986) (stating the legislature may "respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not

---

[13] We believe that courts are not well suited to resolve policy debates based on legislative facts, *i.e.*, empirical studies, statistics, or social scientific theories. Charles Reich captured this point about the limitations of courts well: "Courts have no sources of information other than the record before them, and judges have no special knowledge to assist them in evaluating information of a **social** or **political** nature if they were able to obtain it." Charles A. Reich, *Mr. Justice Black and the Living Constitution*, 76 Harv. L. Rev. 673, 740 (1963) (emphasis added).

significantly impinge on constitutionally protected rights"). But such value-laced judgments are properly left to the legislature.[14]

The dissent accuses the Court of giving "the legislature unrestricted authority to regulate the primary ballot." *Post*, at 23 (opinion of Goff, J.). Not so. Two points merit attention from this sweeping conclusion.

**First**, the Constitution—not five appointed lawyers on the Indiana Supreme Court—grants the General Assembly broad authority to shape election policy. U.S. CONST. art. 1, § 4. True, this power is not unrestricted, but we have recognized that unremarkable principle of constitutional law. *Supra* at 11. Of course, the First and Fourteenth Amendments impose independent limitations on the exercise of government power against individuals. And indeed, courts have a first principles duty to enforce those limits as "the bulwarks of a limited Constitution." FEDERALIST, NO. 78 (Hamilton); *see also Horner*, 125 N.E.3d at 610 (Rush, C.J., concurring in part and dissenting in part) (explaining that courts are "responsible for safeguarding against legislative overreach"). But we must enforce limits when the Constitution requires us to do so. In this case, it does not.

**Second**, not all ballot restrictions demand strict scrutiny under *Anderson-Burdick*. The dissent implies otherwise. It contends the Court contains "**no** analysis" of how the State's interests "are necessary to burden **Rust's** constitutional rights." *Post*, at 23 (opinion of Goff, J.) (emphasis in original). But this broad assertion overlooks the "primacy" of the Supreme Court's "two-track approach" in applying *Anderson-Burdick*.

---

[14] The dissent also points out that, since Indiana's "semi-closed" primary system does not require "formal membership, enrollment, or registration with the party" in order to vote in a party primary, *Herr v. State*, 212 N.E.3d 1261, 1264 n. 1 (Ind. Ct. App. 2023), the State "created" any attendant risk of "party raiding" because there is "no way of determining what a voter intends to do [because] voting is not necessarily indicative of party membership or loyalty." *Post*, at 14–15 (opinion of Goff, J.). Indeed, primary voting may not be dispositive of party membership or loyalty, but that type of normative assessment is reserved for the legislature— which, in this instance, has deemed primary voting to be probative evidence of party affiliation. *Cf. Munro*, 479 U.S. at 195 ("To require States to prove actual voter confusion, ballot overcrowding, or the presence of frivolous candidacies as a predicate to the imposition of reasonable ballot access restrictions would invariably lead to endless court battles over the sufficiency of the 'evidence' marshaled by the State to prove the predicate.").

*Crawford*, 553 U.S. at 205 (Scalia, J., concurring in the judgment). Before we balance rights and interests, courts must first "identify" the **burden** imposed. *Id.* If the burden is "severe," strict scrutiny applies, "and we uphold them only if they are narrowly tailored to serve a compelling state interest." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008) (quotations omitted). But if it is minor, "then the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions on elections procedures." *Id.* at 452 (quotations omitted); *see also Crawford*, 553 U.S. at 205 (Scalia, J., concurring in the judgment) ("Ordinary and widespread burdens [that require] nominal effort of everyone, are not severe.") (quotations omitted).

That is precisely what the Court did here. We first concluded the Affiliation Statute imposes a minor, reasonable and nondiscriminatory restriction on Rust's access to the primary ballot. *Supra* at 15–18. We therefore rejected the dissent's novel premise—one that derives from policy notions of fairness—that the burden imposed is somehow "severe." *Id.* at 16. It is not. The Affiliation Statute has "eminently reasonable" requirements. *Crawford*, 553 U.S. at 209 (Scalia, J., concurring in the judgment). Make no mistake: Rust could have appeared on the Republican primary ballot this May had he voted in the required primaries, but he elected not to do so. That was his choice. No one stopped him. He stopped himself, a dispositive point the concurrence properly emphasizes. *Post*, at 17 (opinion of Molter, J.). The First Amendment does not "shield" Rust from his choices. *Id.* We next pinpointed several legitimate regulatory interests that support this restriction, *supra* at 18–22, which "are generally sufficient" on their own terms, *Washington State Grange*, 552 U.S. 452, but that also directly balance the rights of Rust and the Republican Party under Option A and B, *supra* at 22. Option B, specifically, advances the party's right to limit its candidates, which in turns protects its identifiability and ensures stability in the political system. Each of these is a sufficiently weighty interest. *Id.*

The dissent's ambitious quest to convert these minor restrictions into "severe" burdens requires the "sort of detailed judicial supervision of the election process" that defies the judicial role and constitutional structure. *Crawford*, 553 U.S. at 208 (Scalia, J., concurring in the judgment). In so

doing, the dissent takes Indiana's established presumption of constitutionality of statutes and flips it on its head. *Cf. Horner*, 125 N.E.3d at 588. Indeed, our Court **must** apply strict scrutiny when severe burdens are at play. *Clingman*, 544 U.S. at 592 ("strict scrutiny is appropriate only if the burden is severe"). But the flip side is also true: we must lower our standard and defer to the legislature when it imposes a minor, reasonable and nondiscriminatory restriction that is justified by several legitimate state regulatory interests in elections. To hold otherwise would be a sheer act of political will, not legal judgment. *Cf.* FEDERALIST NO. 78 (Hamilton) (courts may exercise "neither force nor will but merely judgment").

On a fundamental level, the dissent today takes a policy dispute, about which reasonable minds may disagree, and constitutionalizes it "into the language of competing rights," thus recasting this debate into "something ripe for judicial decree rather than resolution by democratic processes." Randall T. Shepard, *A Bill of Rights for the Whole Nation*, 26 Val. U. L. Rev. 27, 32 (1991). Yet a judge who protests that "the [C]onstitution made me do it," often simply means that "things will be better if I do it." *Id.* Maybe so. But today we render our decision within a more limited authority by confining our analysis to the text of the Constitution and corresponding precedent interpreting the First Amendment, which neither prescribes nor endorses a one-size-fits-all policy regime for primary elections. The dissent suggests that the Court today "forsakes its role as a check and balance to the legislature" by deferring to its judgment. *Post*, at 24 (opinion of Goff, J.). Wrong. This Court will check government power when an act of the legislature runs into conflict with the Constitution. *See Holcomb*, 187 N.E.3d at 1273–74 (declaring unconstitutional a law that allowed the legislature to call itself into emergency session). But we will not reinvent the constitutional wheel and invalidate a statute based on our preferences about the fairness of primary elections in Indiana.

We therefore need not second-guess the wisdom of the Affiliation Statute—the expression of a **majority** of Hoosiers who are represented by legislators **they elected** who passed this law, and by a Governor who signed it. *See Columbus, Chi. & Ind. Cent. Ry. Co. v. Bd. of Comm'rs of Grant Cnty.*, 65 Ind. 427, 438 (1878). These citizens—and their wishes as expressed in the Affiliation Statute—would have their will undermined if

the dissent's policy preference won out today. But that assertion of raw judicial power, ironically, made in the people's name, would in the end diminish their power by enlarging ours. While the legislature may change the law, the First Amendment does not compel us to invalidate it.

Because the Affiliation Statute imposes a minor, reasonable and nondiscriminatory restriction on Rust's First Amendment rights, which is justified by the State's interests, it satisfies *Anderson-Burdick* standard.

## II. Rust's other arguments fail on the merits.

We address Rust's remaining arguments in turn and conclude that none of them are successful on the merits.

### A. Vagueness and Overbreadth

Rust's void-for-vagueness challenge turns on the theory that "it is not clear what a party chair must certify" under Option B of the Affiliation Statute. Appellee's Br. at 35. He points to *Ray v. State Election Board*, 422 N.E.2d 714 (Ind. Ct. App. 1981), to conclude that this doctrine applies in the ballot access election context. He also argues that it provides "no guidelines for determining party membership," Appellee's Br. at 36, and thus suffers from constitutional infirmities. Today, we question the premise that the doctrine applies and reject the conclusion even if it does.

To begin with, we are reluctant to find the void-for-vagueness doctrine applies in the civil ballot election context. Traditionally, this doctrine has been generally applied to statutes that **prohibit** certain conduct. *See Karlin v. Faust*, 188 F.3d 446, 458 (7th Cir. 1999) (explaining that "a statute is void for vagueness if it fails to provide 'fair warning' as to what conduct will subject a person to liability"); *see also Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (describing this doctrine "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited"). It "requires only that the law give sufficient warning so that individuals may conduct themselves in a manner which avoids the forbidden conduct." *Chandley Enterprises, Inc. v. City of Evansville*, 563 N.E.2d 672, 675 (Ind. Ct. App. 1990).

The Affiliation Statute does not fit within this traditional understanding of void-for-vagueness because it does **not** prohibit certain conduct, nor is it enforced by civil or criminal penalties. *See* I.C. § 3-8-2-7(a)(4). We are thus averse to applying this doctrine outside the criminal context. *See, e.g., Johnson v. St. Vincent Hospital, Inc.*, 404 N.E.2d 585, 596 (Ind. 1980) (declining to rely on a case from another jurisdiction where the statute had a "clear penal nature" to "establish the proposition of law that the void for vagueness doctrine is applicable to testing non-penal statutes"), *overruled on other grounds by In re Stephens*, 867 N.E.2d 148 (Ind. 2007); *Brunton v. Porter Mem. Hosp. Ambulance Serv.*, 647 N.E.2d 636, 640 (Ind. Ct. App. 1994) (citing *Johnson* for the view that void-for-vagueness applies "only to penal statutes, not to non-penal civil statutes").

But even if this doctrine applied in this context, we would be unpersuaded that it would invalidate the Affiliation Statute.

Void-for-vagueness is about ensuring that an "ordinary person exercising ordinary common sense" has the chance to "sufficiently comply with the statute." *Neudecker v. Neudecker*, 566 N.E.2d 557, 562 (Ind. Ct. App. 1991), *aff'd*, 577 N.E.2d 960 (Ind. 1991). Simply put, it helps ensure fair notice. *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("Vague laws may trap the innocent by not providing fair warning."). But the Affiliation Statute gives Hoosiers fair notice about the conditions required to appear on a primary ballot: **either** the candidate (1) has a recent primary voting record with the party, **or** (2) the candidate attaches a written certification of party membership from the county party chair to their declaration of candidacy. I.C. § 3-8-2-7(a)(4). These two options are "explicit" enough to avoid a void-for-vagueness violation. *Grayned*, 408 U.S. at 108. Either the conditions are satisfied or they are not; there is no vagueness about it.

Rust relies on *Ray* to argue the Affiliation Statute is vague and overbroad. But *Ray* is distinguishable. First, in *Ray*, the court found a statute prohibiting individuals from seeking placement on both Republican and Democratic Party ballots unconstitutional. 422 N.E.2d at 715. The court found the phrase prohibiting persons who "belong[] to any other party" from participating in a primary election to be vague because

it contained no standard on which to judge that determination. *Id.* But here, the Affiliation Statute provides an **objective** metric to determine whether a candidate **has** established sufficient affiliation with a party to appear on the primary ballot: Rust has two options—(a) primary voting or (b) party certification. Thus, they are either met or not. Both options yield clear, not vague, standards. Second, *Ray* involved a situation where the State Election Board—not the party—applied the language of the applicable statute to determine who belonged to which party. *Id.* Here, the party—acting through its county chair—has the power to determine party membership. The Affiliation Statute properly lodges party determinations with the right actor—the **party**, not the state. *See Eu*, 489 U.S. at 224 ("a political party has a right to identify the people who constitute the association," subject to constitutional limits) (cleaned up).

Nor is the Affiliation Statute overbroad. The overbreadth doctrine safeguards constitutional freedoms from freefalling into "the ambit of a statute written more broadly than needed to proscribe illegitimate and unprotected conduct." *Matheney v. State*, 688 N.E.2d 883, 905 (Ind. 1997). Recently, this Court rejected an overbreadth challenge and underscored that "invalidation for overbreadth is strong medicine that has been employed sparingly and only as a last resort." *State v. Katz*, 179 N.E.3d 431, 460 (Ind. 2022) (cleaned up). And "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Id.* (quoting *Members of City of Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984)). Against this risk avoidance posture, *see Katz*, 179 N.E.3d at 460, we find the Affiliation Statute is not overbroad. It provides two reasonably crafted ways to establish party affiliation for a primary: a candidate may choose to affiliate with the Republican by voting in the two Republican Party primaries. I.C. § 3-8-2-7(a)(4). If he elects not to do so, he can still become a candidate in that primary, provided his county party's chair permits it. *Id.*

At its core, the Affiliation Statute strikes a reasonable balance of associational rights for both Rust and the Republican Party. It thus does not require "strong medicine" as a dose of "last resort." *Katz*, 179 N.E.2d at 460; *see also United States v. Williams*, 553 U.S. 285, 292 (2008) (explaining

the Supreme Court has "vigorously enforced the requirement that a statute's overbreadth be **substantial**") (emphasis in original).

Because the Affiliation Statute is neither vague nor overbroad, it survives Rust's void-for-vagueness and overbreadth challenges.

## B. Seventeenth Amendment

Rust also argues that the Affiliation Statute violates the Seventeenth Amendment to the United States Constitution because it "improperly takes rights away from voters and gives them to the state legislature and party chairs." Appellee's Br. at 38. He concludes this "indirectly" limits candidate choices, *id.* at 39, and thus "leads to voter disenfranchisement and an inability to cast votes effectively," *id.* at 38. We disagree.

The Seventeenth Amendment provides in part:

> The Senate of the United States shall be composed of two Senators from each state, elected by the people thereof, for six years; and each Senator shall have one vote. The electors in each state shall have the qualifications requisite for electors of the most numerous branch of the state legislatures.

U.S. CONST. amend. XVII. Indeed, this amendment superseded the original rule in the Constitution that senators be "chosen by the [state] Legislature[s]." *Id.* at art. 1, § 3. In 1913, the Seventeenth Amendment became law. 2 TREATISE ON CONST. L. § 10.10(b)(iv). But the Seventeenth Amendment did not amend the entire Constitution: it did **not** strip states of their power to regulate the "Times, Places, and Manner of holding Elections for Senators and Representatives." *Id.* at art. 1, § 4. Indeed, Article 1, Section 14 ("Elections Clause") equips states with broad "authority to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved." *Thornton*, 514 U.S. at 834 (cleaned up).

Rust argues that the United States Supreme Court's decision in *Thornton*, 514 U.S. 779, is "instructive" given the lack of Seventeenth Amendment precedent. Appellee's Br. at 39. True, *Thornton* is instructive,

but not for the reasons cited by Rust. To be clear, this is not a *Thornton* case, or else Rust could not run at all, including in the general election.

In *Thornton*, the Supreme Court held unconstitutional an Arkansas constitutional amendment that limited the number of times an otherwise-eligible candidate could run for Congress. 514 U.S. at 783. This state constitutional amendment collided with the Seventeenth Amendment's Qualification Clauses. *Id.* at 831. In reviewing the Arkansas amendment, the *Thornton* majority underscored that the Constitution established "fixed" qualifications that could not be amended by states, *id.* at 790, without the proper Article V amendment process, *id.* at 837. *Thornton* concluded that the **text** of the Constitution was enduring and thus it required constitutional amendment for it to be changed. *Id.* at 783.

But *Thornton* also drew a key distinction between substantive changes to minimum congressional qualifications and state regulations of election **procedures**. Under the Election Clause, art. 1, § 4, states are "entitled to adopt 'generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself.'" *Thornton*, 514 U.S. at 834 (quoting *Anderson*, 460 U.S. at 788 n. 9). The Supreme Court has ratified other state regulations of elections procedures, without finding them to contain "any substantive qualification rendering a class of potential candidates ineligible for ballot position." *Id.* at 835; *see, e.g., Storer*, 415 U.S. at 724 (upholding California law forbidding ballot access to independent candidates who registered with a qualified political party within one year before the preceding primary election); *Munro*, U.S. at 194–95 (upholding Washington law requiring a minor-party candidate receive at least one percent of votes cast in the primary election before their name would be placed on the general-election ballot); *Burdick*, 504 U.S. at 433 (upholding Hawaii's prohibition on write-in voting). At base, these procedural regulations were calibrated to ensure that elections are "fair and honest . . . and [that] some sort of order, rather than chaos, . . . accompan[ies] the democratic processes." *Id.* (cleaned up). And, in each of these cases, the Supreme Court recognized the central "state interest in protecting the integrity and regularity of the election process," independent of "any attempt to evade the constitutional prohibition against the imposition" of other qualifications. *Thornton*, 514 U.S. at 835.

The State argues that the constitutional amendment in *Thornton* is "far removed" from the Affiliation Statute, which merely creates a procedural **condition** for access to a party's primary ballot. Appellants' Br. at 40. We agree this is the proper characterization. Simply put, the Affiliation Statute exists within a broader election code ecosystem, where procedures are designed to regulate "the time, place, and manner of holding primary and general elections, the registration and qualifications of voters, and the selection and qualification of candidates." *Storer*, 415 U.S. at 730. Rust overlooks this critical distinction identified in *Thornton*, and argues the Affiliation Statute "indirectly violates" the Seventeenth Amendment. Appellee's Br. at 39. But the Affiliation Statute does **not** substantively add minimum qualifications for the general election or to hold the office of United States Senator. And it does not block Hoosiers from voting for a Senator in the primary or general elections. It simply erects a minor procedural bar for primary ballot access consistent with the Constitution.

Because the Affiliation Statute is a mere procedural regulation that does not substantively change the minimum qualifications for United States Senate, it survives Rust's Seventeenth Amendment challenge.

## C. Equal Protection under the Indiana Constitution

Rust presses a **state** constitutional claim that the Affiliation Statute violates his equal protection rights under Article 1, Section 23 of the Indiana Constitution. Appellee's Br. at 41. He argues that he suffered from (1) "disparate treatment" and that (2) this treatment was "not related to inherent characteristics." *Id.* at 44. *Id.* at 44. We disagree.

Article 1, Section 23 of the Indiana Constitution states: "The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens." IND. CONST. art. 1, § 23. In *Collins v. Day*, 644 N.E.2d 72 (Ind. 1994), this Court adopted a two-part test for determining whether a statute is valid under this constitutional provision:

> **First**, the disparate treatment accorded by the legislation must be reasonably related to inherent characteristics which distinguish the unequally treated classes. **Second**, preferential treatment must be

> uniformly applicable and equally available to all persons similarly situated.

*Id.* at 80 (emphasis added).

Indiana courts presume the statute in question is constitutional. *Id.* The burden is then placed "on the challenger to negate every conceivable basis which might have supported the classification." *Whistle Stop Inn, Inc. v. City of Indianapolis*, 51 N.E.3d 195, 199 (Ind. 2016) (cleaned up). In an Article 1, Section 23 challenge, "it is the disparate classification alleged by the challenger, not other classifications, that warrants review." *Myers v. Crouse-Hinds Div. of Cooper Indus., Inc.*, 53 N.E.3d 1160, 1165 (Ind. 2016).

Rust raises an **as-applied challenge** that "he is being treated differently than candidates who were able to be on the ballot prior to the July 2021 Amendments and differently than those candidates who have a more reasonable party chair that certifies based on party membership alone." Appellee's Br. at 41. The State counters that the statute is not unconstitutional "because it imposes the same requirements on anyone seeking to declare candidacy in a party's primary." Appellants' Br. at 41.

We agree with the State there is no equal protection violation as applied to Rust. The Affiliation Statute applies the **same** requirements on everyone who desires to run in a party's primary election, including Rust. I.C. § 3-8-2-7(a)(4). Two reasons reinforce our conclusion today.

**First,** Rust lacks an inherent characteristic to qualify for the ballot because he elected not to vote in the last three primary elections. But these choices do not reflect an "inherent" characteristic cognizable under our Privileges and Immunities Clause jurisprudence. *See, e.g.*, *Whistle Stop Inn*, 51 N.E.3d at 200 (citing *Collins* for the proposition that "the prevalence of sole proprietorships and small employment units" and "the distinctive nature of farm work" were "inherent characteristics of Indiana agricultural employers"); *Gambill v. State*, 675 N.E.2d 668, 677 (Ind. 1996) (acknowledging "mental illness" as an inherent characteristic); *Horseman v. Keller*, 841 N.E.2d 164, 172 (Ind. 2006) (confirming that not being present at the polling site on Election Day was inherent of an absentee voter).

**Second**, Rust did not allege a valid classification. Here, he alleges two disparate classifications. But both fail. At first, he claims that he is being treated differently than candidates who ran **before** July 2021 under the previous iteration of the Affiliation Statute. Yet this is not a valid classification because it compares candidates under different statutes. *See Collins*, 644 N.E.2d at 78. Any candidate seeking placement on the 2024 primary ballot—Republican or Democrat—must comply with the current version of the Affiliation Statute. *See* I.C. § 3-8-2-7(a)(4). Candidates before the July 2021 amendments are thus not similarly situated to Rust.

Next, Rust alleges that he is being treated differently than candidates who have "more reasonable [county] party chairs." Appellee's Br. at 41. This is also not a valid classification because the Affiliation Statute treats **all** candidates the same: without satisfying the primary voting condition, all potential candidates must be certified by their county party chair. I.C. § 3-8-2-7(a)(4). And supposed differences based on the proclivities or idiosyncrasies of county chairs—including amorphous, indeterminate notions of "reasonableness"—are based on the party chair's **discretion**, not on the operation of the Affiliation Statute. Appellants' Reply Br. at 29. Thus, we are hard pressed to find this alleged class valid.

Because the Affiliation Statute does not treat Rust unequally, it survives his equal protection challenge under Article 1, Section 23.

## D. Improper Amendment to the Indiana Constitution

Rust advances another state constitutional claim, arguing that the Affiliation Statute "improperly" amends Article 4, Section 7 of the Indiana Constitution, which establishes eligibility requirements to run for the **State** Senate and House of Representatives. Appellee's Br. at 45. His argument is that the Affiliation Statute modifies this provision without following the amendment process. Unusually, this claim is about Rust's status as a **voter**—not as a candidate for federal office—as "he seeks to have all willing and constitutionally eligible candidates on the ballot so that he may have meaningful choices and cast his vote effectively." *Id.* at 46. He argues that the Affiliation Statute "adds extra requirements" to our Constitution. *Id.* at 45. The State objected, in part, because Rust lacks standing. We share the State's concern.

We thus decline to reach the merits of this claim because Rust lacked standing as a voter in Indiana. He has not asserted a direct injury that he has "suffered" or is "in immediate danger of suffering . . . as a result of the complained-of conduct." *Solarize Indiana,* 182 N.E.3d at 217 (cleaned up); *see also Holcomb*, 187 N.E.2d at 1286 (explaining that, without an injury, a court cannot review the merits of a claim). To be precise, Rust is not running for State office and "he has not identified a new resident or . . . a Hoosier that is . . . adversely affected by" the Affiliation Statute that Rust would vote for. Appellants' Br. at 44. He lacks standing to press this issue.

Because Rust lacks standing to bring this claim as a voter under Article 4, Section 7, his claim will not be reviewed on the merits.

## E. Invalid Use of Discretion under Affiliation Statute

Finally, Rust argued that Chairperson Lowery's discretion in applying the Affiliation Statute was invalid and illegal because it "violates multiple canons of statutory construction." Appellee's Br. at 48. Rust argues that her discretion: (1) conflicts with the purpose and spirit of the law; (2) engrafts words onto the statute; (3) renders a portion of the statute meaningless; and (4) conflicts with Indiana Code Section 3-10-1-2.

Rust is mistaken: the canons of interpretation support—not undermine—Lowery's discretion. When interpreting words in a statute, this Court's "first task" is to assign words their "plain meaning," *ESPN, Inc. v. University of Notre Dame Police Dept.*, 62 N.E.3d 1192, 1195 (Ind. 2016), to unlock the legislature's intent. *Nicoson v. State*, 938 N.E.2d 660, 663 (Ind. 2010). If we neglected this elemental task, "we would be rewriting" unambiguous language, and therefore disrupting our "separation-of-powers because it is the legislature that writes and revises statutes while [courts] merely interpret and apply them." *Indiana Right to Life Victory Fund v. Morales*, 217 N.E.3d 517, 524 (Ind. 2023); *see also Ind. Wholesale Wine & Liquor Co. v. State ex rel. Ind. Alcoholic Beverage Comm'n*, 695 N.E.2d 99, 108 n.21 (Ind. 1998) ("On the other hand, separation of powers prevents a court from effectively rewriting a statute to save it from constitutionality infirmity."). And, of course, statutory language itself is the best indication of legislative intent. *Nicoson*, 938 N.E.2d at 663.

The Affiliation Statute's plain language compels our conclusion that Lowery's discretion was not invalid or illegal. Option B states: "a candidate is considered to be affiliated with a political party only if . . . [t]he **county chairman** of: the political party with which the candidate claims affiliation; and the county in which the candidate resides; **certifies that the candidate is a member of the political party**." I.C. § 3-8-2-7(a)(4) (emphasis added). By its terms, Lowery has broad discretion to certify that Rust is a member of the Republican Party. Her broad discretion is a feature—not a bug—of the Affiliation Statute, for it again recognizes a party's First Amendment rights in the exercise of associational discretion.

There were concerns raised in oral argument that the Affiliation Statute lacked any criteria to guide or cabin the county chair's discretion, but such an attempt to restrict that exercise of discretion may raise First Amendment concerns, as well. Moreover, the power to reject obviously assumes the **power to welcome**. In modern times, we have seen candidates with fame, fortune, or a following nominated by state and national parties with little or no prior affiliation, in an exercise of legitimate party self-interest and discretion. In 2016, the Indiana Republican Party welcomed Trey Hollingsworth on the primary ballot for Indiana's 9th District congressional seat—although he **never** voted in an Indiana primary—because he secured certification from the Clark County party chair.[15] Other historical examples illustrate the broad sweep of party discretion. After defeating Hitler, General Eisenhower was courted by both national parties in 1948 and 1952 for the presidential nomination[16]; in 1964, Massachusetts native Robert Kennedy became a Senator from New

---

[15] *See* Tim Evans and Mark Alesia, *Trey Hollingsworth for Congress—rich carpetbagger or breath of fresh air?*, Trey Hollingsworth for Congress — rich carpetbagger or breath of fresh air? (indystar.com) [https://perma.cc/Y4PM-U2LG].

[16] Before the 1948 election, President Truman proposed in a private meeting with Eisenhower that they both run on the Democratic ticket, with Eisenhower as the presidential candidate and Truman as his running mate. After Truman won in 1948, Senator Henry Cabot Lodge Jr., of Massachusetts began a campaign in the Republican Party to draft Eisenhower as the GOP presidential nominee in 1952, which proved successful. *See* Chester J. Pach, Jr., *Dwight D. Eisenhower: Campaigns and Elections*, https://millercenter.org/president/eisenhower/campaigns-and-elections [https://perma.cc/VS4E-9MD3].

York, without having lived in the state. Just under four decades later, Hillary Clinton of Washington, D.C., by way of Arkansas and Illinois, did the same. If, for instance, the Obamas were to return to their native Chicagoland and move across the street to Hammond, the Affiliation Statute would not bar Democratic Party officials from allowing either to run in a Senate primary, despite a lack of primary voting history in this state, so long as they satisfied modest residency requirements.[17] The Affiliation Statute—by its terms—unassailably allows for this outcome.

Political parties do not exist to lose elections. The blunt lesson of these examples is that if you fail to comply with voting history requirements but they think you can win, they will let you in; if they think you hurt their chances or do not represent their values, they will keep you out. The Affiliation Statute reasonably recognizes and respects that reality without offending the Constitution or any canon of construction.

# Conclusion

Because the Affiliation Statute is not unconstitutional, and because Rust's remaining arguments lack merit, we reverse the trial court and remand with instructions to enter judgment for the State.

---

[17] The United States Constitution fixes the substantive qualification requirements to run for United States Senate. *See* U.S. CONST. art. I, § 3 ("No person shall be a senator who shall not have attained to the age of thirty years and been nine years a citizen of the United States, and who shall not, when elected, be an inhabitant of that state for which he shall be chosen."). States, in turn, cannot add substantive congressional candidacy qualifications not specified in the Constitution. *See Thornton*, 514 U.S. at 783. But they can impose "evenhanded" restrictions to protect the integrity of the electoral process. *Id.* at 834. Thus, to be declared a candidate for United States Senate in Indiana, state election law provides that a petition must contain, relevant here, "the **residence address** of each petitioner as set forth on the petitioner's voter registration record." I.C. § 3-8-2-8(b)(3) (emphasis added). Further, Indiana law provides further modest protection that "[t]he county voter registration office in the county where a petitioner is registered must certify whether each petitioner is a voter at the **residence addressed listed in the petition** at the time the petition is being processed, and whether that address is located within the election district for office." I.C. § 3-8-2-9 (emphasis added). Put simply, the bar for establishing candidate residency for United States Senate in Indiana is low. Certainly, you could establish residency without having to vote in two party primaries.

Slaughter and Molter, JJ., concur.

Molter, J., concurs with separate opinion in which Slaughter, J., joins.

Goff, J., dissents with separate opinion in which Rush, C.J., joins.

ATTORNEYS FOR APPELLANTS, DIEGO MORALES AND INDIANA
ELECTION COMMISSION

Theodore E. Rokita
Attorney General of Indiana
Angela N. Sanchez, Chief Counsel of Appeals
Benjamin M.L. Jones, Section Chief, Civil Appeals
Kyle Hunter, Assistant Section Chief, Civil Appeals
Office of the Indiana Attorney General
Indianapolis, Indiana

ATTORNEY FOR APPELLANT, AMANDA LOWERY

E. Ryan Shouse
Lewis and Wilkins LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEE, JOHN RUST

Michelle C. Harter
Lekse Harter, LLC
Greenwood, Indiana

ATTORNEYS FOR AMICUS CURIAE, THE INDIANA REPUBLICAN
STATE COMMITTEE, INC.

Jackie M. Bennett, Jr.
Vivek R. Hadley
Hayley A. Sears
Taft Stettinius & Hollister LLP
Indianapolis, Indiana

ATTORNEYS FOR AMICI CURIAE, COMMON CAUSE INDIANA
AND LEAGUE OF WOMEN VOTERS OF INDIANA

William R. Groth
Daniel Bowman
Bowman & Vlink, LLC
Indianapolis, Indiana

**Molter, J., concurring.**

I agree that all of John Rust's claims fail for the reasons the Court's opinion explains. For Rust's First Amendment claim, the volleys between the Court's opinion and the dissenting opinion continue great debates our country has been having since its founding about how democracy functions best and the role of judges in our divided government. I take no position on the best way to run elections, and between the competing views of the judicial role, I align more closely with the Court's opinion.

But I write separately to demonstrate that when we walk through the First Amendment analysis with smaller steps, we can resolve this case without having to resolve those bigger debates. The bottom line boils down to this: the Affiliation Statute limits primary candidates to those who are either party members or who vote in the party's primary elections, and the United States Supreme Court interprets the First Amendment as *compelling* that sort of limitation rather than *prohibiting* it. The Affiliation Statute does not impermissibly burden Rust's First Amendment rights because its requirement to either become a party member or vote in the party's primaries was not too onerous for Rust to satisfy. Instead, Rust did not satisfy the requirement because the party exercised its own First Amendment right to deny his membership, and he chose not to vote in the party's primaries.

## I. The Affiliation Statute's Operation

Evaluating the Affiliation Statute's constitutionality becomes easier after recognizing three key aspects of the statute's operation.

First, the statute provides two paths to appear on a party's primary ballot: a party-controlled membership path, and a candidate-controlled voting history path. Those are alternative paths reflecting legislative balancing; neither option is an exception to or a relief valve from the other.

Second, for the party-controlled membership path, the local party chair certifies only party membership. The chair does not have broader discretion to decide whether the party gives one of its members permission to run for a particular office.

Third, if the aspiring candidate disagrees with the local party chair's membership decision, the candidate can, at a minimum, appeal that decision through the party's internal appeal process.

## A. The Affiliation Statute provides alternative routes to the primary ballot that reflect legislative balancing.

As the Court's opinion explains, the Affiliation Statute provides two paths onto a primary ballot—one over which the *party* has complete control, and the other over which the aspiring *candidate* has complete control. The option the party controls is for the county chair where the candidate resides to certify that the candidate "is a member of the political party." Ind. Code § 3-8-2-7(a)(4)(B). The option the candidate controls is to cast their two most recent primary ballots in the primary election for the party with which they claim affiliation. *Id.* § 3-8-2-7(a)(4)(A). Those ballots can be in recent elections or elections long ago; elections that were close together, or far apart. All that matters is that both ballots were for the party with which the candidate claims affiliation.

There seems to be confusion over how these two options relate to each other. Sometimes they are discussed as though one is an exception to or a relief valve from the other. But that isn't how the statute is written.

Instead, the two options are alternatives that reflect a legislative balance. The party-controlled membership option reflects the State's legitimate interest in protecting political parties' First Amendment rights to determine their own membership, representatives, and leadership. *N.Y. State Bd. of Elections v. López Torres*, 552 U.S. 196, 202 (2008) ("A political party has a First Amendment right to limit its membership as it wishes, and to choose a candidate-selection process that will in its view produce the nominee who best represents its political platform.").

But a political party's First Amendment rights over control of its candidate-selection process "are circumscribed" when "the State gives the party a role in the election process" by administering a state-run primary election. *Id.* at 203. Then "the State acquires a legitimate governmental

interest in ensuring the fairness of the party's nominating process, enabling it to prescribe what that process must be." *Id.*

The candidate-controlled voting history option reflects the State's interest in fair elections. To advance that interest, the State made the policy choice to broaden the candidate pool so that it includes those who are affiliated with a political party through their primary voting history, even if the party does not count them as members. The State didn't have to broaden the candidate pool, but having done so, requiring some measure of party affiliation was appropriate. *Cal. Democratic Party v. Jones*, 530 U.S. 567, 567 (2000) (holding that California's blanket primary for determining a political party's nominee for the general election violated the political parties' First Amendment rights).

So the candidate-controlled voting history option is not "a restriction on an individual's ability to choose and to change his or her party affiliation." *Post*, at 15 (emphasis omitted). The parties and individuals remain free to associate to whatever extent they agree. The voting history option merely limits which candidates who claim party affiliation will be listed on a primary ballot, even though the party does not necessarily acknowledge the candidates as party members.

Rust complains that one reason Lowery gave for refusing to certify his party membership is that his two most recent primary votes were not in a Republican primary. (Four out of his last five votes were in the Democratic primary.) He says Lowery, in effect, adopted the candidate-controlled voting history criteria as the criteria for party membership. And that is improper, he argues, because it renders the party-controlled option "meaningless/useless." Appellee's Br. at 50.

But the political parties have the First Amendment right to limit their membership however they wish, including by adopting a statutory standard as their own. *López Torres*, 552 U.S. at 202. Here, that means the parties remain free to adopt the voting history criteria as their own membership criteria, even if that makes the party-controlled option redundant of the candidate-controlled option.

While the party-membership option leaves it to the parties to define their membership however they wish, that leads to another source of confusion, which is determining exactly what local party chairs are supposed to certify.

## B. For the party-controlled option, county chairs certify only party *membership*, not *permission* to run for a particular office.

Rust contends some county chairs are not following the statutory provision for the party-controlled membership option because they read words into the statute. More than just certifying whether an aspiring candidate is a party *member*, Rust says those chairs mistakenly believe they have broader power to decide whether to give candidates the party's *permission* to run for a particular office.

At oral argument, Rust's attorney fleshed this out with some good examples. She said she represented another client who had a Republican Party membership card, who was listed on the party website as a sponsor, and who wanted to run for state representative. The county chair would certify the candidate as a party member if the candidate ran for a county office, but not if the candidate ran for a state office. Another client reported a similar experience. He could run on a Republican primary ballot as a candidate for delegate to the Republican Party State Convention, but the county chair would not certify his party membership if he ran for Congress.

Those cases aren't before us now, so we don't know whether that is the fairest representation of the facts or not. But even just considering them to be hypothetical examples, they are illustrative. The plain meaning of the Affiliation Statute's text does not delegate that sort of discretion to county chairs. The statute says the county chair certifies whether the candidate is "a member of the political party." I.C. § 3-8-2-7(a)(4)(B). That's it. Nothing in the statute authorizes the county chair to withhold that certification because the chair doesn't want the candidate to seek the party's nomination for a particular office.

Consistent with the political parties' First Amendment rights, the statute lets the parties determine who their members are, and the statute delegates to county chairs the responsibility to certify that a candidate is a party member. But as Rust bluntly puts it: "The statute does not provide for either the [Indiana Election] Commission or a county party chairman to make decisions about who should run." Appellee's Br. at 49. He is right about that much.

Once a party includes someone as a member, the statute requires the party to let them run for any office if they satisfy the remaining statutory and constitutional requirements.

## C. A candidate can challenge a local party chair's membership decision through the party's internal appeal process.

Even when local party chairs properly limit their decisions to whether aspiring candidates are party members, disputes can arise about whether the chairs made the right decisions. Here, Lowery says she consulted with other Jackson County Republican Central Committee members, and her reasons for concluding Rust was not a party member included that he had voted in Democratic primaries twice as often as Republican primaries. Her decision to deny Rust's party membership also aligned with the party's definition of a "Qualified Primary Republican," which is "a voter who cast [a] Republican Party ballot at the two (2) most recent primary elections in Indiana which the voter voted, and who is a Republican in Good-Standing." Rules of the Ind. Republican State Comm. Rule 1-24.[1]

But Rust argues that Lowery and her colleagues should have instead evaluated his party membership against the party's definition of a "Republican in Good Standing," which is "a Republican who supports

---

[1] *See* Rules of the Ind. Republican State Comm. (2023), *available at* https://www.indiana.gop/sites/default/files/10%2012%2023%20Rules%20of%20the%20Indiana%20Republican%20Party.pdf [https://perma.cc/KA3E-4N39].

Republican nominees and who does not actively or openly support another candidate against a Republican nominee." *Id.* R. 1-25. Rust believes he satisfies that definition.

We can't know whether Lowery or Rust is correct about which definition the party would apply for its membership and whether the party would agree with Lowery's application of that definition because Rust didn't appeal Lowery's decision to higher levels of the party. Of course, the fact that the Republican Party filed an amicus brief in our Court supporting Lowery's decision is a strong indication that it agrees with her membership determination. Regardless, the same party rules Rust cites to establish his party membership also provide an internal party appeal process. And for candidates like Rust who disagree with the county chair's decision whether to certify their membership, the party provides a hearing and appeal process. The appeal goes first to the party's District Committee, and then to its State Committee. *Id.* R. 1-30 to -35.

The Indiana Democratic Party defines its membership differently, but it has a similar internal appeal process. That party has decided: "Any legally qualified Indiana voter who supports the purposes of the Party may be a member." Rules of the Ind. Democratic Party Rule 8(a).[2] And as with the Republican Party, someone who disagrees with a lower-level decision about their membership can appeal the decision all the way to the Indiana Democratic Party's State Committee. *Id*. at R. 20.

Rust suggested at oral argument that he wasn't aware of an internal party appeal process. But that process is spelled out in the very same party rules that the Republican Party publishes on its website and which Rust has been citing throughout the litigation to show that he is a member of the Republican Party.

Perhaps Rust instead thought an internal party appeal would be futile because the party already endorsed Representative Banks and would

---

[2] *See* Rules of the Ind. Democratic Party (2023), *available at* https://indems.org/wp-content/uploads/2023/10/IDP-Rules-April-2023.pdf [https://perma.cc/6GU8-BE7A].

therefore exclude Rust as a member so he couldn't run for the party's nomination to the Senate. But whether an appeal over Lowery's membership decision would be futile, the party still gets to decide for itself who its members are. *López Torres*, 552 U.S. at 202 ("A political party has a First Amendment right to limit its membership as it wishes . . . ."). And the Seventh Circuit's decision in *Hero v. Lake County Election Board* demonstrates there are mechanisms for political parties (not just the party's county chair) to determine who its members are for purposes of the Affiliation Statute and to communicate those membership decisions to election officials. 42 F.4th 768, 776–77 (7th Cir. 2022).

## II. The Affiliation Statute's Constitutionality

After establishing how the Affiliation Statute operates, the constitutional analysis rests on stronger footing. Rust's argument that some county chairs are not complying with the Affiliation Statute is a reason to *enforce* the statute, not to *invalidate* it as unconstitutional. While Rust disagrees with Lowery's decision that he is not a party member, he opted not to pursue the party's internal appeal process or to seek relief in the courts to compel Lowery's certification. And he cannot skip to the nuclear option of invalidating the statute before exhausting all other options for compelling statutory compliance consistent with the Constitution.

As for the merits of Rust's First Amendment challenge, both the Court's opinion and the dissenting opinion appropriately decline Rust's invitation to declare the statute unconstitutional on its face. Rust's as-applied challenge fails because his own concessions foreclose any claim that the statute unduly burdens his First Amendment rights. He acknowledges the State can limit primary candidates to party members, so the party-controlled membership option does not impose an unconstitutional burden. That concession alone defeats his First Amendment claim because adding a second path to an independently sufficient path to the primary ballot cannot impose an undue burden. But even if we evaluate the voting history option too, Rust's claim fails because he does not identify any

burden keeping him from voting in primary elections. He simply chose not to.

## A. Rust's claim that some party chairs don't follow the statute is a reason to *enforce* it, not to *invalidate* it.

Rust argues that Lowery, acting in an official capacity as a state actor, did not comply with the Affiliation Statute, and if she had, Rust would be on the ballot. Specifically, Rust contends he qualifies as a party member under the party's rules, and the statute therefore required Lowery to certify his party membership. Lowery has strong counterarguments that she did follow the statute, but even if Rust is right that she didn't, that is a reason to *enforce* the statute, not to *invalidate* it.

Rust responds that simply enforcing the statute in his case doesn't go far enough because the statute is hopelessly vague, and that vagueness will lead other county chairs to violate the statute in other elections. But as explained above, the statute isn't vague, and it operates just as Rust claims it should. The party-controlled membership option requires the local party chair to certify only party membership, not permission to run for a particular office. And if the aspiring candidate disagrees with the chair's membership determination, the candidate can appeal that decision through the party's internal appeal process.

We reach constitutional issues only as a last resort. *WTHR-TV v. Milam*, 690 N.E.2d 1174, 1176 (Ind. 1998) (declining the parties' invitation to "reach a constitutional issue as [a] matter of first not last resort"). And here, Rust had other options available to him to compel Lowery's compliance with the statute short of asking the courts to invalidate it. At a minimum, he could have exhausted the party's internal appeal process to challenge Lowery's membership decision.

Rust also sued Lowery in her "official capacity" because the Affiliation Statute "empowers her to certify candidates who are members of the party." App. Vol. 2 at 37, 39–40. That is, Rust alleges Lowery was a state actor in an official capacity when she refused to certify Rust's party membership. It is unsurprising that, having sued Lowery, Rust alleged

she was a state actor because the First Amendment restricts only state action, not private conduct. *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986) (recognizing that the First Amendment "by its terms applies only to governmental action"); *see also Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928–29 (2019) (explaining that "a private entity may qualify as a state actor when it exercises powers traditionally exclusively reserved to the State," that "very few functions fall into that category," and one function falling into this narrow category is "running elections" (quotations omitted)); *Finger v. State*, 799 N.E.2d 528, 532 (Ind. 2003) ("A private entity is deemed a state actor when the state delegates to it a traditionally public function.").

If Rust is right that Lowery was a state actor with a ministerial duty to certify party membership, then the mandate statute may have authorized him to sue Lowery to compel her to certify his party membership. I.C. § 34-27-3-1 ("An action for mandate may be prosecuted against any inferior tribunal, corporation, public or corporate officer, or person to compel the performance of any: (1) act that the law specifically requires; or (2) duty resulting from any office, trust, or station."). Or if that statute didn't apply, he may have been able to sue for a mandatory injunction compelling certification. *Warriner Invs., LLC v. Dynasty Homeowners Ass'n, Inc.*, 189 N.E.3d 1119, 1126 (Ind. Ct. App. 2022) ("An injunction which orders a party to take a specific action is referred to as a mandatory injunction.").

Those remedies may have ultimately proved unavailable for any number of reasons, including that Rust may not be right that Lowery was a state actor with a duty to certify his membership. *See Price v. Ind. Dep't of Child Servs.*, 80 N.E.3d 170, 175 (Ind. 2017) ("Judicial mandate is appropriate only when two elements are present: (1) the defendant bears an imperative legal duty to perform the ministerial act or function demanded and (2) the plaintiff has a clear legal right to compel the performance of that specific duty." (cleaned up)); *Bd. of Comm'rs of Jackson Cnty. v. State*, 46 N.E. 908, 913 (Ind. 1897) ("A duty to be performed is none the less ministerial because the person who is required to perform it may have to satisfy himself of the existence of a state of facts under which he is given his right or warrant to perform the required duty."). But Rust was

the master of his complaint, and after alleging that Lowery was a state actor refusing to fulfill a statutory duty, he abandoned his pursuit for relief to compel her statutory compliance. We can't invalidate the statute before Rust demonstrates that invalidating the statute on constitutional grounds is his last resort rather than his first. *WTHR-TV*, 690 N.E.2d at 1176.

## B. Rust's First Amendment claim fails as both a facial challenge and as an as-applied challenge.

For ballot access cases like this one, courts evaluate First Amendment challenges through *Anderson-Burdick* balancing. *Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992). "Election regulations that impose a severe burden on associational rights are subject to strict scrutiny, and we uphold them only if they are narrowly tailored to serve a compelling state interest." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008) (quotations omitted). "If a statute imposes only modest burdens, however, then the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions on election procedures." *Id.* at 452 (quotations omitted).

Critical here, reviewing the constitutionality of an election law requires attention to whether the plaintiff asserts a facial challenge or an as-applied challenge. *See generally* Joshua A. Douglas, *The Significance of the Shift Toward As-Applied Challenges in Election Law*, 37 Hofstra L. Rev. 635 (2009). A facial challenge alleges there are no circumstances in which the State could enforce a statute without violating someone's constitutional rights, requiring the court to stop the State from enforcing the statute against anyone (or at least against a group of people beyond just the plaintiff in a set of circumstances where applying the statute would never be constitutional). *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010). An as-applied challenge alleges only that enforcing the statute against the plaintiff would violate the plaintiff's constitutional rights, requiring the court to stop the State from enforcing the statute against only the plaintiff, but not anyone else. *Id.*

While the trial court invalidated the Affiliation Statute on its face, Rust's attorney clarified at oral argument in our Court that Rust asserts both a facial and an as-applied challenge. The dissenting opinion adheres to the guidance from the United States Supreme Court that facial challenges to election laws are disfavored, and the dissent reaches the more limited conclusion that the Affiliation Statute is unconstitutional only as applied to Rust. But I agree with the Court's opinion that Rust's First Amendment challenge fails as both a facial challenge and as an as-applied challenge.

## 1. Rust cannot prevail on a facial challenge.

Prevailing on a facial challenge requires the plaintiff to prove that "no set of circumstances exists under which the Act would be valid, *i.e.*, that the law is unconstitutional in all of its applications." *Wash. State Grange*, 552 U.S. at 449 (quotations omitted). Rust isn't challenging the State's primary election scheme or the broader statutory scheme for accessing the general election ballot on the whole. He is just challenging the two options the General Assembly offers candidates through the Affiliation Statute for establishing party affiliation so that they can appear on a political party's primary ballot: (1) become a member of the party (which the county chair certifies); or (2) cast the two most recent primary votes for the same party.

Those two options—party membership or voting history—do not, on their face, violate the First Amendment because they do not severely restrict aspiring candidates' access to the ballot, and they are justified by the sufficiently weighty State interests that the Court's opinion explains. Rust disagrees, arguing that the Affiliation Statute is unconstitutionally burdensome in three ways, but each argument fails.

### a. Excluding candidates from the ballot

Rust argues that by providing only these two routes for appearing on a primary ballot, the Affiliation Statute "severely burdens" candidates' rights to associate with the Republican Party because the statute excludes

some candidates from appearing on primary ballots. Appellee's Br. at 19. But that argument confuses the consequence with the burden.

All ballot access cases involve the consequence of excluding a candidate from a ballot, and courts don't treat the exclusion as such as the burden. Instead, the burden is the contested ballot access requirement. *See, e.g.*, *Anderson*, 460 U.S. at 782 ("The question presented by this case is whether Ohio's early filing deadline placed an unconstitutional burden on the voting and associational rights of Anderson's supporters."). Here, that requirement is to be either a party member or someone who votes in the party's primaries. And for a facial challenge, we evaluate how onerous that requirement is generally, without regard to any specific candidates or specific elections.

Rust stresses that this year's Republican primary election for the party's Senate nomination will be uncontested if he is excluded from the ballot, but a facial challenge must consider all the other elections too. That includes all the congressional races this year that include many primary candidates, and the Republican primary election for governor, which has five candidates. For the full scope, we should also consider that the Secretary of State's 2022 Candidate List for the primary election was 303 pages long.[3] Rust doesn't claim that the Affiliation Statute couldn't be enforced consistent with the First Amendment in any of those races, or even that on balance, the Affiliation Statute's two options for ballot access have generally proved too burdensome.

Rust also doesn't cite any case that stands for or supports the proposition that a state violates the First Amendment by limiting primary candidates to those who are members of a party or vote in the party's primaries. Just the opposite, the United States Supreme Court has concluded that political parties' First Amendment rights *compel* states to impose party affiliation requirements for primary elections to select the

---

[3] *2022 Primary Election Candidate List*, Ind. Sec'y of State (May 3, 2022), https://www.in.gov/sos/elections/files/2022_Primary_Candidate_List.pdf [https://perma.cc/ZU78-PP72].

parties' nominees for the general election. *Cal. Democratic Party*, 530 U.S. at 567 (holding that California's blanket primary for determining a political party's nominee for the general election violated the political parties' First Amendment rights). That is why Rust concedes that the First Amendment permits the State to limit ballot access to party members and to defer to the parties to certify their membership, Oral Argument at 21:00–23:05, 27:55–30:50, which is precisely how the party-controlled membership option currently operates.

Bolstering the statute's constitutionality on its face is the fact that certification of party membership or primary voting history is a well-worn tool for establishing party affiliation. For example, the Affiliation Statute's two options are the same two options to establish party affiliation for appointments to state entities with party-affiliation requirements. I.C. § 36-1-8-10(b). And as the Republican Party's amicus brief demonstrates, more than three dozen state entities depend on these methods for establishing party affiliation. *See* Ind. Republican State Comm. Amicus Br. at 19–20 n.3 (collecting statutory cites). Some entities— like police and fire merit commissions—depend on an even longer voting history, requiring that an individual's three most recent primary votes be cast for the affiliated party. I.C. § 36-8-3.5-6(c). Service to those important public entities is just as important a First Amendment exercise as running for elected office, and there is no suggestion here that those statutes violate the First Amendment.

### b. Ineligibility for the candidate-controlled voting history option

Rust also argues the statute is unconstitutional on its face because he estimates that 81% of Hoosiers do not qualify for the candidate-controlled voting history option. That argument fails for a couple of reasons.

For starters, the percentage of Hoosiers eligible under the voting history option tells us nothing about the percentage eligible under the party membership option. Rust seeks to invalidate both provisions on their face, so he has the burden to prove the Affiliation Statute as a whole—not just the voting history option—imposes an undue burden.

But even for the candidate-controlled voting history option, Rust's numbers are incomplete. He reaches the 81% figure by citing surveys stating that 79% of Hoosiers identify as Republican or Democrat, and 24% of Hoosiers voted in the 2020 primary. Multiplying 79% by 24% yields 19%, which Rust says leaves the remaining 81% of Hoosiers ineligible to run as a Republican or a Democrat. Looking at how many Hoosiers voted in one year's primary tells us nothing about how many Hoosiers' most recent two primary votes—in any years—were for the same political party.

In short, Rust's statistical extrapolations are incomplete and do not demonstrate that the statute is unconstitutional on its face.

### c.    Access to voting history records

Rust also argues that the candidate-controlled voting history option is severely burdensome because some people might not have access to voting history that they need to establish their eligibility, such as voters who last voted before records were digitized in 2003. That is not a facial challenge because it is not an argument that the Affiliation Statute is unconstitutional in all circumstances. It is an argument that the statute is unconstitutional in limited circumstances where a candidate doesn't have access to that voting history. Or, if Rust intends this as a facial challenge in the sense that the Affiliation Statute is overly burdensome in all circumstances where the potential candidate is neither a party member nor has access to their voting history, Rust lacks standing to make that claim because he is neither such a candidate nor a voter seeking to cast a vote for such a candidate. *Pence v. State*, 652 N.E.2d 486, 488 (Ind. 1995).

### 2.  Rust cannot prevail on an as-applied challenge either.

The dissenting opinion expressly declines Rust's request to invalidate the Affiliation Statute on its face, concluding instead that the statute should be enjoined only as to Rust. And significantly, the dissent acknowledges that "the legislature is best suited to weigh the costs and

benefits of a given ballot restriction." *Post*, at 1. So while our written opinions engage in larger debates about the role of elections in democracy and the role of judges in a divided government, the disagreement among us that matters for resolving this case is much narrower: three of us conclude that requiring Rust to comply with the Affiliation Statute does not violate his First Amendment rights, and two of us conclude that it does.

We all also agree that the State's interests in the Affiliation Statute "are certainly legitimate in the abstract." *Id.* at 13. So for Rust's as-applied challenge, we must weigh those legitimate interests against the statute's burden on Rust's individual First Amendment rights. As with his facial challenge, Rust claims the burden on his First Amendment rights is that he is excluded from the primary ballot. But again, he confuses the *consequence* of statutory noncompliance with the *burden* of compliance. All ballot access challenges involve exclusion from the ballot. A plaintiff cannot prevail on an as-applied challenge just by saying that a requirement for a filing fee, petition signatures, party membership, party affiliation, or any other ballot access requirement violates their First Amendment right to party affiliation because failing to satisfy the requirement excludes them from the ballot.

Here, the burden on Rust is to either become a member of the Republican Party or vote in its primary elections. We must therefore evaluate whether the impediments to Rust either obtaining party member certification or voting in the party's primaries are substantial enough that he has demonstrated the statute's burdens on him so clearly outweigh its benefits that the statute violates his First Amendment rights. Rust has not demonstrated that.

### a.  Party membership

Rust's own concessions foreclose any claim that the party-controlled membership option is unconstitutionally burdensome. He concedes, as he must, that Indiana can limit primary candidates to party members, and that the State can rely on the parties to determine and certify their own membership. The dissenting opinion likewise acknowledges that the

"Republican Party certainly has the right to exclude non-members and to bar people it disfavors from officially representing it." *Id.* at 17; *see also id.* at 20 (acknowledging that "the parties always retain a First Amendment right to disassociate from any person and thereby block them from the ballot"); *id.* at 23 ("To be sure, a party may justifiably seek to prevent unsavory individuals . . . from becoming a candidate.").

That should end the analysis of Rust's as-applied First Amendment claim because that is all the party-controlled membership requirement does. The statute simply lets the parties determine their own membership and relies on local party chairs to certify that membership. And that is all that happened here. Lowery decided Rust wasn't a member of the Republican Party, and the Republican Party has backed her up by filing an amicus brief in our Court supporting her decision. Rust could have challenged Lowery's decision through the party's internal appeal process, but he chose not to.

Critically, Rust is not claiming it is too burdensome to obtain party membership certification. He is not, for example, saying he couldn't satisfy the party membership requirement because it is just too hard to track down the local party chair and obtain the certification. He is instead complaining that the party refuses to acknowledge his membership. That isn't a dispute about a burden. That is a dispute about how to resolve a conflict between Rust's First Amendment right to seek membership in the Republican Party and the Republican Party's First Amendment right to exclude Rust from the party. And the law is clear and undisputed on that point. The party has the right to determine its membership for itself. *López Torres*, 552 U.S. at 202 ("A political party has a First Amendment right to limit its membership as it wishes . . . .").

All agree the First Amendment permits States to limit primary candidates to party members. Applying the party-controlled membership option to Rust does only that, so it does not violate the First Amendment.

### b. Voting history

There is no need to go any further. If the party-controlled membership option is not unconstitutionally burdensome by itself, then it can't be unconstitutionally burdensome to offer candidates a second path to the ballot that the candidates control. But even if we evaluate the candidate-controlled voting history option in isolation, Rust also failed to carry his burden to prove that the voting history requirement is too onerous for him to satisfy.

Rust voted in the 2016 Republican primary and four Democratic primaries before that, so obviously voting in primaries is not unduly burdensome for him. He simply chose not to vote in the 2020 or 2022 Republican primaries. Had he voted in either of those elections, he would have satisfied the requirements of the voting history option, would have established his affiliation with the Republican Party, and would have been entitled to appear on a 2024 Republican primary ballot.

Rust claims he did not vote in the 2020 primary because "that election was moved due to Covid-19." Appellee's Br. at 10. But in his deposition, the State asked Rust why changing the primary's date prevented Rust from participating. Rust responded that he "believe[d] [he] had to work . . . and couldn't vote the day they moved it to." App. Vol. 2 at 187. And when reminded that he could have voted absentee without excuse in that election, Rust merely stated "I don't know." *Id.*

Nothing prevented Rust from participating in the 2022 Republican primary either, or at least he didn't prove there was any unconstitutional burden on his ability to vote. Again, when asked why he didn't vote in that election, Rust said, "I was probably working and could not vote. I don't know." *Id.* at 240.

Rust's choice not to vote in the 2020 or 2022 Republican primary elections was his prerogative, and I agree with the dissenting opinion that Rust had no obligation to vote in any primary. *Post*, at 15. But the First Amendment doesn't shield Rust from the consequences of his own choices. His as-applied challenge requires him to identify a severe

restriction on his ability to access the ballot. And because he can't, his as-applied challenge fails.

## III.  Conclusion

The First Amendment permits States to limit primary election candidates to those who are party members or vote in the party's primary elections. That is all the Affiliation Statute does, and Rust has failed to carry his burden to prove that requiring him to comply with the statute violates his First Amendment rights. I therefore agree with the Court's conclusion that we must vacate the injunction and that judgment must be entered for the defendants.

Slaughter, J., joins.

**Goff, J., dissenting.**

Because I believe the application of the Affiliation Statute to John Rust violates his First Amendment right of association, I respectfully dissent from the decision of the Court.[1]

The Republican Party's 2024 primary election to select their nominee for United States Senate will feature one candidate. That person's nomination will therefore be uncontested. Meanwhile, Rust—who's donated thousands of dollars to national Republicans, who adheres to the Republican Party platform's core beliefs, and whose participation has been welcomed by his local Republican party—is barred by the Statute because he failed to vote in two consecutive Republican Party primaries and the party's county chairperson has refused to certify him as a party member. The burden imposed on Rust by these restrictions, in my view, is unjustified by the interests advanced by the State. And while the legislature is best suited to weigh the costs and benefits of a given ballot restriction, this Court is still responsible for safeguarding against legislative overreach.

## I. Primary elections emerged to divest party leaders of control over the nominating process, but today's system can impose onerous barriers on candidates.

Disputes over the regulation of party primaries "are inherently intraparty squabbles pitting one component of the party (voters and candidates) against another (usually the party organization)." Nathaniel Persily, *Candidates v. Parties: The Constitutional Constraints on Primary Ballot Access Laws*, 89 Geo. L.J. 2181, 2185 (2001). In finding no violation of Rust's associational rights, the Court focuses on the State's "legitimate interest in

---

[1] Because I would resolve Rust's challenge narrowly on as-applied First Amendment grounds, I refrain from addressing his other claims under principles of constitutional avoidance. *See Indiana Land Tr. Co. v. XL Inv. Properties, LLC*, 155 N.E.3d 1177, 1182–83 (Ind. 2020).

safeguarding parties from forced inclusion of unwanted members and candidates." *Ante*, at 19. But this position, it's worth emphasizing, stands in stark contrast to the reason primaries in Indiana emerged to begin with: to **limit** the power of party leaders to dictate nominations. Primaries are not meant to be opportunities for party leaders to crown their favored candidates—and certainly not in uncontested ballots.

## A. Primaries are a chance for the voters (*i.e.*, the party-in-the-electorate), not just party leaders, to select nominees.

For much of the nineteenth century, the selection of candidates for public office took place in caucuses—small, closed-party meetings led by local party leaders. Trevor Potter & Marianne H. Viray, *Barriers to Participation*, 36 U. Mich. J.L. Reform 547, 549 (2003). While excluding the participation of rank-and-file party members, caucuses allowed the party itself to control the nominating process with virtually no legal restrictions. *Id.*; *see also* Adam Winkler, *Voters' Rights and Parties' Wrongs: Early Political Party Regulation in the State Courts, 1886-1915*, 100 Colum. L. Rev. 873, 876 (2000). The lack of state oversight, however, lent itself to widespread abuses—from vote buying to intimidation at the polls. In Indiana (as in other states), the parties furnished their own ballots, often printed on a distinctive color of paper, to ensure that "voters voted as they were paid to do." Emma Lou Thornbrough, Indiana in the Civil War Era, 1850-1880, at 40 (1965).

As caucuses fell under increasing criticism for the level of control they gave to party bosses, some states, including Indiana, introduced a more representative method of nomination—the convention system. Lauren Hancock, Note, *The Life of the Party: Analyzing Political Parties' First Amendment Associational Rights When the Primary Election Process is Construed Along a Continuum*, 88 Minn. L. Rev. 159, 164–65 (2003); *see generally* J.F. Connell, *Indiana Primary Laws*, 18 Ind. Mag. Hist. 224 (1922). Under this system, delegates chosen by local party leaders attended state or national party meetings, charged with "transmitting, from local assemblies, the wishes and impulses of the mass of party membership to a

central point, where the selection of nominees was made." V.O. Key, Politics, Parties, & Pressure Groups 373 (5th ed. 1964). While the convention model quickly took root, it too drew criticism for the degree of control exercised by party leaders over the ballot. Hancock, *supra*, at 164–65. In Indiana, endorsement from the county chairperson remained crucial for those seeking elected office. "Without such backing candidates had little hope of winning." Justin A. Walsh, The Centennial History of the Indiana General Assembly, 1816-1978, at 359 (1987).

By the 1880s, the intensity of party politics in Indiana generated "popular questioning about how nominees were endorsed and elected." *Id.* Persistent charges of corrupt practices at the polls "cast doubt over the entire electoral process," generating a sense of urgency among lawmakers to reform the state's balloting methods. *Id.*; Clifton J. Phillips, Indiana in Transition: The Emergence of an Industrial Commonwealth, 1880-1920, at 29 (1968). Indeed, "public faith" in elections had "become shaken," Democratic Governor Isaac Gray lamented, leading to a widespread belief "that the decision at the ballot box no longer reflect[ed] the honest judgment of a majority of the voters." S. Journal, 56th Gen. Assemb., Reg. Sess. 45 (Ind. 1889). Gray's successor, Republican Governor Alvin Hovey, expressed similar concerns, warning that, if the "contending parties" remained free to perpetuate "fraud and corruption" upon the ballot box, a "moneyed aristocracy" would "control the destinies of our Nation." *Id.* at 103. To remedy this evil, he opined, "every means should be taken to accurately and honestly ascertain the evidence of [the people's] will." *Id.*

The General Assembly's response was twofold: regulating voting procedures and expanding voter participation in the nomination process. The legislature took its first step toward reform in 1889 with the adoption of the Australian-ballot system. This system created the official state ballot form and prohibited all persons, except election officials and voters, from approaching within fifty feet of a polling place, enabling Hoosiers to cast their votes in secret. Phillips, *supra*, at 30; Ray Boomhower, *"To Secure Honest Elections": Jacob Piatt Dunn, Jr., and the Reform of Indiana's Ballot*, 90 Ind. Mag. Hist. 311, 324 (1994). While the parties lost control over the ballot, they secured equal representation on the election boards. Phillips, *supra*, at 30.

These reforms prompted a "growing recognition that the individual's right to vote included participation in party nominating procedures." Winkler, *supra*, at 881; *see also* Charles C. Binney, *American Secret Ballot Decisions*, 41 Amer. L. Reg. & Rev. 101, 105–06 (1893) (arguing that the right to vote extended beyond general elections to include "the right to designate the candidate of one's choice"). What resulted was a series of measures, in the first decade of the twentieth century, to gradually replace party control over the selection of candidates with the popular vote.[2] In 1915, primary-election advocates in Indiana won their greatest victory with the passage of a mandatory, statewide law.[3] Walsh, *supra*, at 360; Connell, *supra*, at 228–29. The act required primary elections for all township, city, county, state, and congressional nominees, and it obligated delegates to state and national conventions to support any candidate for president, United States senator, or governor who received a majority vote. Walsh, *supra*, at 360–61. So sweeping was its scope, one historian wrote, that the measure "deprived party machines all over the state of exclusive power over nominations for public office." *Id.* at 517. Indeed, while subject to its own imperfections, the primary system in Indiana stood on the idea that "members of the party should have the privilege of nominating their party's candidates directly and without unreasonable dictation from party leaders" who could "not be held legally or morally responsible for that dictation." Connell, *supra*, at 227.

To be sure, as the Court points out, the state has, since 1915, vacillated in its method of candidate selection—reverting to the convention system

---

[2] A 1901 law, which applied only to Marion and Vanderburgh Counties, changed little in the electoral landscape, as it left primaries optional, with discretion vested in local parties. Walsh, *supra*, at 360; Connell, *supra*, at 228. A 1907 law, applicable only to counties with the largest populations, made primaries mandatory for the nomination of all county, township, and city officers, as well as for precinct committeemen and delegates to the congressional and state conventions. Walsh, *supra*, at 360; Connell, *supra*, at 229.

[3] To further bolster public confidence in the state's electoral system, the General Assembly had enacted a corrupt-practices act in 1911, imposing criminal penalties on those found tampering with voting machines at general and primary elections alike. Connell, *supra*, at 230.

in 1929 before returning to primaries in 1975.[4] *Ante*, at 10–11. But such changes in the state's approach to the nomination process did not diminish the role of the voter. As this Court emphasized in 1935, the purpose of "**all** election laws" in Indiana—including those "controlling the activities of political parties, party conventions, and primaries, and providing for the manner in which the names of candidates may be put upon the ballots"—is ultimately "to secure to the elector an opportunity to freely and fairly cast his ballot, and to **uphold the will of the electorate** and prevent disfranchisement." *Lumm v. Simpson*, 207 Ind. 680, 683–84, 194 N.E. 341, 342 (1935) (emphases added).

## B. Indiana's current primary system features a high barrier to candidate entry.

While the advent of primaries advanced public participation in the selection of representatives, "it has long been accepted that states must necessarily regulate elections, even through restricting candidate access to the ballot." Potter & Viray, *supra*, at 547. After all, a "procedure inviting or permitting every citizen to present himself to the voters on the ballot without some means of measuring the seriousness of the candidate's desire and motivation would make rational voter choices more difficult because of the size of the ballot." *Lubin v. Panish*, 415 U.S. 709, 715 (1974).

Still, the type and severity of ballot restrictions administered by the state—*e.g.*, filing fees or petition-signature requirements—may impose significant barriers to participation for genuine candidates. The most onerous burdens tend to "undermine the competitive character of an electoral system," depriving the voters of "a meaningful range of choices on the ballot." Persily, *supra*, at 2189, 2190. This lack of competition, in

---

[4] The General Assembly repealed the statewide law in 1929, marking a "reversion to the system of the 1890s when party conventions had exclusive control" over most nominations for public office. Walsh, *supra*, at 362–63. But given the "wide popular support for direct primaries" in Indiana, lawmakers restored direct elections for legislative candidates just two years later. *Id.* at 517. State conventions, however, retained the power for several years to endorse presidential candidates and to select nominees for the U.S. Senate. *Id.* at 517 & n.1.

turn, has resulted in extremely low voter turnout in recent years. *See generally* Bipartisan Policy Ctr., 2022 Primary Turnout: Trends and Lessons for Boosting Participation (2023). In Indiana, the average turnout rate for eligible voters at primary elections between 2010 and 2022 hovered at just above fifteen percent. *Id.* at 29–32.

Despite these figures, Indiana imposes some of the highest hurdles for primary-ballot access in the nation. For example, whereas New Jersey and Ohio require a candidate for U.S. Senator to collect 1,000 signatures,[5] Indiana's election code requires a candidate seeking the same office to collect at least 4,500 signatures from registered voters statewide—500 signatures from each of Indiana's nine Congressional districts. Ind. Code § 3-8-2-8(a).

Adding to this burden, the General Assembly recently amended Indiana's election code to make it even harder for potential candidates to add their names to the primary ballot. Before 2021, a person could run as a primary candidate if the "most recent primary election in Indiana in which the candidate voted was a primary election held by the party with which the candidate claims affiliation" or if the county chair of the political party with which the candidate claimed affiliation certified the candidate as a member of the political party. I.C. § 3-8-2-7(a)(4) (2017) (repealed). Effective January 1, 2022, a person is eligible only if the "**two (2)** most recent primary elections in Indiana in which the candidate voted were primary elections held by the party with which the candidate claims affiliation." Pub. L. No. 193-2021, § 17, 2021 Ind. Acts 2719, 2731–32 (codified at I.C. § 3-8-2-7(a)(4)(A)) (emphasis added)). If the prospective candidate fails to meet this two-primary requirement, then the only way onto the primary ballot is through the county chair certifying the candidate's membership. *Id.* (codified at I.C. § 3-8-2-7(a)(4)(B)). From my research, it appears that no other state that uses a primary system like

---

[5] *See* N.J. Stat. Ann. § 19:23-8 (West); Ohio Rev. Code Ann. § 3513.05 (West).

Indiana's imposes such an onerous affiliation requirement to run for U.S. Senate.[6]

Needless to say, these added hurdles have generated challenges from prospective candidates in recent years. *See, e.g.*, *Bookwalter v. Indiana Election Comm'n*, 209 N.E.3d 438 (Ind. Ct. App. 2023); *Rainey v. Indiana Election Comm'n,* 208 N.E.3d 641 (Ind. Ct. App. 2023). Adding to this list of disaffected Hoosiers, John Rust, a prospective Republican candidate for the U.S. Senate, sued state election officials and his local Republican Party chairperson, arguing that the Affiliation Statute violates his constitutionally protected rights to freely associate with the party and to cast his vote effectively. App. Vol. 2, p. 45.

## II. The Affiliation Statute violates Rust's right to associate with the Republican Party as its nominee for U.S. Senate.

The Court insists that "the State could abolish its primary system altogether and provide no opportunity for Rust to exercise his associational rights if it so desired." *Ante*, at 23. Though certainly true, this proposition misses the point. While "states enjoy near absolute authority in their decisions whether to create democracy, **once they do so**, they invite constitutional scrutiny over every aspect of the system they enact." Persily, *supra*, at 2209 (emphasis added). So, "primary elections, while not constitutionally required, must abide by certain constitutional rules once the state (or party as state actor) makes them part of the selection process for representatives." *Id.*

---

[6] Most states simply require a candidate to file a declaration of candidacy affirming party membership or affiliation. *See, e.g.*, 10 Ill. Comp. Stat. Ann. 5/7-10 (West); N.J. Stat. Ann. § 19:23-7 (West); Iowa Code Ann. § 43.18 (West). An Ohio statute renders a candidate ineligible if they "voted as a member of a different political party at any primary election within the current year and the immediately preceding two calendar years." Ohio Rev. Code Ann. § 3513.191(A) (West). But this restriction applies only to persons holding an elective office for which candidates are not nominated at a primary election. *Id.* § 3513.191(B) (West).

When reviewing First and Fourteenth Amendment challenges to state election laws, courts apply the balancing test established in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). Under the *Anderson/Burdick* test, courts weigh "the character and magnitude of the asserted injury" to the plaintiff's constitutional rights against "the precise interests" offered by the state to justify the restriction and the "extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick*, 504 U.S. at 434 (internal citation and quotation marks omitted). Courts will apply a heightened, strict-scrutiny standard—requiring a narrowly tailored regulation that advances a compelling state interest—whenever the regulation subjects First Amendment rights to "severe restrictions." *Id.* (internal citation and quotation marks omitted). If, on the other hand, the regulation "imposes only reasonable, nondiscriminatory restrictions" upon those rights, "the State's important regulatory interests" generally suffice "to justify the restrictions." *Id.* (internal citation and quotation marks omitted). Still, no matter how "slight [the] burden may appear," that burden "must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (internal citation and quotation marks omitted). And if there's "a less drastic way of satisfying its legitimate interests," the state "may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties." *Anderson*, 460 U.S. at 806 (internal citation and quotation marks omitted).

Here, the Affiliation Statute (or just Statute) bars Rust's candidacy because, although the last primary he voted in was the 2016 Republican Party primary, he voted before that in the 2012 Democratic Party primary. *See* I.C. § 3-8-2-7(a)(4)(A). And despite welcoming Rust's participation in the party, his Republican county chairwoman decided not to certify him as "a member of the political party." *See* I.C. 3-8-2-7(a)(4)(B).

The State Defendants argue (A) that any limitation on Rust's ballot access is minor because, regardless of the Statute's effect on a party's primary election, Rust can still access the general election ballot through other means; and (B) the State itself has a compelling interest in regulating elections and preserving parties' associational rights to govern their own

membership. Appellants' Br. at 15. Even if strict scrutiny applies, the State Defendants insist, the Statute is still constitutional because it's narrowly tailored to balance the rights of all involved and furthers the State's allegedly compelling interests. *Id.* at 16–17.

In my view, the Affiliation Statute substantially burdens Rust's associational rights and the State fails to offer precise interests sufficient to justify this burden under the *Anderson/Burdick* test.

### A. The Affiliation Statute substantially burdens Rust's associational rights.

I agree with the Court that Rust does not have "a fundamental right to run for United States Senate as **the** Republican nominee." *Ante*, at 13. But Rust **is** relying on rights that rank among the "most precious freedoms" in our system of representative democracy: "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively."[7] *Anderson*, 460 U.S. at 787 (quoting *Williams v. Rhodes*, 393 U.S. 23, 30–31 (1968)). And while a state may restrict ballot access in the public interest, it can do so only by means that do not "unfairly or unnecessarily burden" the electorate's right to vote and a candidate's "equally important interest in the continued **availability of political opportunity.**" *Lubin*, 415 U.S. at 716 (emphasis added).

Still, the State Defendants argue that the restriction imposed on Rust is "minor" because the Affiliation Statute only limits his access to the primary ballot. Appellants' Br. at 22. And his right to access the primary ballot, they insist, is "less compelling" than his right to access the general-election ballot. *Id.* at 20. After all, Defendants emphasize, "Rust can still run for the U.S. Senate as a Libertarian, a minor party candidate, an

---

[7] Rust brought this claim as both a candidate and as a voter. App. Vol. 2, p. 37.

independent, or write-in candidate under Indiana law." *Id.* at 25 (citing I.C. § 3-8-4-10(b); I.C. § 3-8-6-3; I.C. § 3-8-2-2.5(a)).[8]

In my view, these arguments misconstrue Rust's claim and miss the point. Rust is not seeking to "vindicate a right to get on the general ballot any way possible." Appellee's Br. at 20. Rather, he seeks the opportunity to associate with "like-minded" Republican Party supporters by standing as a U.S. Senate nominee for the Indiana Republican Party. *Id.* The alternative paths relied on by the State Defendants offer no meaningful opportunity for Rust to exercise his associational rights as a candidate or a voter. Furthermore, Rust's exclusion from the primary impinges on his prospective supporters' rights "to associate for political purposes" and to "cast their votes effectively." *See Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986).

In any case, the purported write-in and independent candidacy options are not equivalent to standing in a party primary.

As a write-in candidate, Rust would need to file the proper forms and a statement of economic interests, among other things. *See generally* I.C. § 3-8-2-2.5. And while he must still "file a declaration of intent to be a write-in candidate," I.C. § 3-8-2-2.5(a); *see also* I.C. § 3-12-1-1.7(a)(1) (specifying that "only votes cast for declared write-in candidates shall be counted and certified"), his name would never actually appear on the ballot. This path to the general election, the U.S. Supreme Court has recognized, is simply

---

[8] State Defendants argue further that Rust "could also seek to fill any ballot vacancy for the Democratic, Libertarian, or Republican parties because the Affiliation Statute does not apply to the statutory ballot vacancy procedures." Appellants' Br. at 25 (citing I.C. § 3-13-1-20). That may be true, but vacancies open only sporadically, and, in any case, there is no current vacancy in either of Indiana's U.S. Senate seats.

"not an adequate substitute for having the candidate's name appear on the printed ballot."[9] *Anderson*, 460 U.S. at 799 n.26.

To run as an independent candidate, Rust would have to secure the valid signatures of two percent of the total number of voters who voted in the most recent election for Indiana Secretary of State. *See* I.C. § 3-8-6-3(a). The total number of statewide voters who voted in the most recent election was 1,847,179, two percent of which equals **36,944**. *See* Amicus Br. of Common Cause at 26. That latter figure is **more than eight times** the number of signatures—4,500—needed to run for U.S. Senate as a major party candidate. *See* I.C. § 3-8-2-8(a).

Aside from this hurdle, a person may run as an independent candidate only if the individual "states" that he or she is "not affiliated with any political party." I.C. § 3-5-2-26.6. Rust, however, has repeatedly asserted his Republican bona fides and has consistently declared his intent to run as a Republican. App. Vol. 2, pp. 178–80, 184. What's more, he testified under oath that he would be lying if he were to run as an independent candidate.[10] App. Vol. 3, p. 29. These statements notwithstanding, Rust would risk falling out of good standing with the Republican party if he were to run as an independent (or Libertarian), potentially barring him for an extended period from seeking elected office in Indiana as a Republican. *See* Rules of the Ind. Republican State Comm. 1-6 (stating that a person is "not in good standing in the Party and may be removed for cause" if he "openly supports a candidate" who "oppos[es] a Republican Candidate"); *Hero v. Lake Cnty. Election Bd.*, 42 F.4th 768, 770–71 (7th Cir. 2022) (noting a

---

[9] Even assuming he could mount an effective write-in campaign, there are several provisions of the election code that would disqualify a vote for such candidates. For example, "the name or office of a candidate written in a place on the ballot other than the place reserved for write-in voting may not be counted for that office." I.C. § 3-12-1-1.7(a)(2). A write-in vote is likewise void "if the voter attempts to cast the vote by a means other than printing the name of the candidate in ink or lead pencil." I.C. § 3-12-1-1.7(a)(3).

[10] Rust's failure to declare party affiliation under the Affiliation Statute would not free him to run as an unaffiliated independent. The Affiliation Statute's criteria for party affiliation apply to that provision only. *See* I.C. § 3-8-2-7(a)(4) (laying down the two-primary rule and certification option "[f]or purposes of this subdivision").

long-time Republican's ten-year bar from the party for his support of independent candidates). The State Defendants appear to have acknowledged as much in the trial court. *See* Tr. Vol. 2, p. 25 (discussing the circumstances of the *Hero* case).

Still, the Court suggests that Rust may, as an independent candidate, "'tout his Republican virtues, tell voters he supports Republicans, put up yard signs to that effect, and run on a platform identical to any political party.'" *Ante*, at 15 (quoting *Hero*, 42 F.4th at 776). But campaigning in such a manner presents further risks to the candidate. Claiming affiliation with a major political party is expressly prohibited by Indiana's election code, for both independent candidates and write-in candidates alike. I.C. § 3-8-6-5.5; I.C. § 3-8-2-2.5(b)(4). And these candidates may face legal challenges if their statements could lead a voter to confuse them with a candidate from a major political party. *See, e.g.*, I.C. § 3-8-1-2.

In short, there is no realistic way for Rust to hold himself out to others as a Republican in the general election, other than standing in the Republican Party's primary. The Affiliation Statute therefore imposes a heavy burden on his associational rights.

## B. The State's alleged interests are insufficiently weighty to justify the ballot restrictions as applied to Rust.

For this Court to sustain the Affiliation Statute, the constitutional injury to Rust must be justified and counterbalanced by the "precise interests" offered by the State that "make it necessary to burden" his rights. *Burdick*, 504 U.S. at 434 (internal quotation marks and citation omitted). Here, the State Defendants invoke the need to prevent "voter confusion by preserving party identifiability, avoiding ballot overcrowding and frivolous candidacies, and maintaining order, rather than chaos, in Indiana's primary and general elections." Appellants' Br. at 27; *see also id.* at 15–16 (citing the need to maintain fair and honest elections, preserve party identities, enhance party-building efforts, guard against party raiding, and avoid voter confusion, ballot overcrowding, and frivolous candidacies).

While these interests are certainly legitimate in the abstract, they fall far short, in my view, of justifying the Statute's ballot-access restrictions as applied to Rust.

### 1. There's no potential for ballot overcrowding.

The United States Supreme Court has long recognized a state's "interest in keeping its ballots within manageable, understandable limits." *Lubin*, 415 U.S. at 715. That overcrowded ballots "discourage voter participation and confuse and frustrate those who do participate is too obvious to call for extended discussion." *Id.* Here, however, the potential for ballot overcrowding isn't even an issue. Rust's exclusion from the primary ballot means that the remaining Republican contender will run **unopposed**. To be sure, a state need not prove actual voter confusion or ballot overcrowding. *Munro*, 479 U.S. at 195. To impose such a requirement would require a state's "political system [to] sustain some level of damage before the legislature could take corrective action." *Id.* But with nothing here to suggest that the "election ballot was becoming cluttered with candidates" in recent years, the idea of the Affiliation Statute as a response to "potential deficiencies in the electoral process" simply lacks merit. *Cf. id.* at 195–96.

I also recognize that the state has a legitimate interest in seeing that ballots are not encumbered by the names of candidates with no substantial support. *Lumm*, 207 Ind. at 683, 194 N.E. at 342; *see also Munro*, 479 U.S. at 197–98 (candidates must show that "they enjoy a modicum of community support in order to advance to the general election"). But the petition statute, in my view, adequately serves this interest. *See* I.C. § 3-8-2-8 (requiring a potential candidate for U.S. Senator to collect at least 500 signatures from registered voters in each of Indiana's nine Congressional districts).

## 2. There's likewise no potential for party raiding or a frivolous candidacy.

The state's interest in guarding against party raiding and frivolous candidates likewise fails to carry the day. For one thing, this concern carries little weight at the primary stage, given the other ballot-access requirements and the fact that the voters—*i.e.*, the party-in-the-electorate—can simply vote against a candidate who does not represent their values. In any case, as noted above, Rust repeatedly asserted his Republican bona fides and testified under oath that he would be lying if he were to run as an independent candidate. App. Vol. 2, pp. 178–80, 184. What's more, when presented with certain "core beliefs" listed in the Republican Party platform, Rust explicitly stated that he adhered to each of them. App. Vol. 3, pp. 19–20. To be sure, Rust may have voted years ago in Democratic primaries for people he knew personally through his church or for those who were pro agriculture. But he testified to having never contributed to a Democratic candidate financially (while donating over $10,000 to Republican candidates), and he's always voted for Republican candidates in the general elections. App. Vol. 2, pp. 40, 42.

Beyond these points, the State Defendants' purported interest in protecting against the risk of party raiding is highly suspect because the State itself created that risk in the first place through the primary voting method it adopted. While often deemed a "closed primary" system, Indiana's system is more akin to a "semi-closed" primary, "in which a political party's primary is open not only to members but also to independent voters," given that "no formal membership, enrollment, or registration with the party is required."[11] *Herr v. State*, 212 N.E.3d 1261, 1264 n.1 (Ind. Ct. App. 2023). Moreover, there's no way to determine whether a voter intends "to vote at the next general election for a majority

---

[11] To vote in a party's primary in Indiana, a person must be registered to vote and must have "at the last general election, voted for a majority of the regular nominees of the political party holding the primary election." I.C. § 3-10-1-6(1). Alternatively, the registered voter must intend "to vote at the next general election for a majority of the regular nominees of the political party holding the primary election." I.C. § 3-10-1-6(2).

of the regular nominees of the political party holding the primary election." *See* I.C. § 3-10-1-6(2). And with no way of determining what a voter intends to do, voting is not necessarily indicative of party membership or loyalty.

Still, the Court and the concurrence conclude that the Affiliation Statute imposes no burden on Rust because he simply could have voted at either the 2020 or 2022 Republican primaries to supplement the vote he cast at the 2016 Republican Primary. *Ante* at 22; *id.* at 17 (opinion of Molter, J.).

This conclusion, in my view, misses the point.

For one thing, Rust had no obligation to vote at these previous primary elections. Unlike some jurisdictions in other parts of the world, "[w]e have no compulsory voting laws in Indiana." *Spickermon v. Goddard*, 182 Ind. 523, 532, 107 N.E. 2, 5 (1914); *see* Eric Lund, *Compulsory Voting: A Possible Cure for Partisanship and Apathy in U.S. Politics*, 31 Wis. Int'l L.J. 90, 94–101 (2013) (discussing compulsory voting laws in Belgium and Australia).

Second, and more importantly, the idea that Rust could simply have voted in the 2020 or 2022 Republican Primaries fails to appreciate the Statute for what it actually is—a restriction on an individual's ability to choose **and to change** his or her party affiliation, which **unmistakably** implicates the associational freedoms guaranteed by the First Amendment. *See Storer v. Brown*, 415 U.S. 724, 731 (1974); *Kusper v. Pontikes*, 414 U.S. 51, 57 (1973). The Affiliation Statute, in effect, **locks** voters into their party affiliation for **at least two years** after voting in a primary, if not longer (depending on when they last voted in a primary). *See Kusper*, 414 U.S. at 57, 61 (invalidating a statute which locked voters into their party affiliation for twenty-three months after they voted in their party's primary).

To be sure, the U.S. Supreme Court has recognized a state's interest in imposing a durational party-affiliation requirement, but **only** to protect against "candidacies prompted by **short-range** political goals." *Storer*, 415 U.S. at 735 (emphasis added). The idea of party raiding, "its potential disruptive impact, and its advantages to one side" over another, the Court has explained, "are not likely to be as apparent to the majority of enrolled

voters" or even the "professional politician just prior to a November general election when concerns are elsewhere as would be true during the 'primary season.'" *Rosario v. Rockefeller*, 410 U.S. 752, 761 (1973) (quoting the appellate court). What's more, "[f]ew persons have the effrontery or the foresight to enroll as say, 'Republicans' so that they can vote in a primary some seven months hence, when they full well intend to vote 'Democratic' in only a few weeks." *Id.* (quoting the appellate court). And only the "rare politician" could effectively "urge his constituents to vote for him or his party in the upcoming general election, while at the same time urging a cross-over enrollment for the purpose of upsetting the opposite party's primary." *Id.* (quoting the appellate court).

Based on this reasoning, courts have struck down long-term party-affiliation requirements while upholding those that are relatively short in duration **and** that focus on preventing the political opportunism that arises just before an election campaign. *Compare Kay v. Brown*, 424 F. Supp. 588, 591, 593, 595 (S.D. Ohio 1976) (holding unconstitutional a state statute barring primary-ballot access if the candidate voted for a "different political party at any primary election within the next preceding four calendar years"), *with State ex rel. Billings v. City of Point Pleasant*, 460 S.E.2d 436, 437, 443–44 (W. Va. 1995) (upholding a requirement for a candidate to file a verified statement that he or she "has not been registered as a voter affiliated with any other political party for a period of sixty days" before announcing his or her candidacy for public office). As the United States District Court for the Southern District of Ohio aptly observed, the "state's interest in promoting party loyalty and party attachment is **not** in preserving the status quo within a party, but is in assuring the integrity of a party's candidate selection process." *Kay*, 424 F. Supp. at 593 (emphasis added).

By effectively penalizing him for having voted in the Democratic Primary **twelve years ago**—despite his vote in the Republican Primary in 2016, despite the thousands of dollars he's contributed to the national Republican Party over the years, and despite his adherence to the core beliefs of the party's platform—the Affiliation Statute's durational requirement works an especially significant hardship on Rust. Sure, he could have voted in the 2020 or 2022 Republican Primaries. But

"[r]equiring a voter to decide before casting his ballot in a party primary whether he might not [several] years in the future want to run for office as the candidate of another party," in my view, clearly constitutes a "drastic means of accomplishing the state's goals." *See Kay*, 424 F. Supp. at 593.

### 3. The State's purported interest in protecting the parties' associational rights is limited.

Beyond the interests cited above, the State Defendants invoke the need to preserve the "parties' associational rights to govern their own membership." Appellants' Br. at 15. The Republican State Committee agrees, arguing that Rust has no "right to force his inclusion on a particular party's primary ballot." Amicus Br. at 9–10.

The Republican Party certainly has the right to exclude non-members and to bar people it disfavors from officially representing it. But this important right does not necessarily align with the State's interest. The State's interest in regulating the primary ballot is to "protect it as a means of democratic choice" (*e.g.*, by seeking to avoid voter confusion), **not** to "produce any particular outcome." Persily, *supra*, at 2222. A political party's interests in regulating the ballot, on the other hand, "are explicitly factional and anti-state." *Id.* Indeed, for the party, the "primary exists to further the interests of a subset of the electorate—not the electorate itself." *Id.* Accordingly, the U.S. Supreme Court has emphasized that "care must be taken not to confuse the interest of partisan organizations with governmental interests." *Elrod v. Burns*, 427 U.S. 347, 362 (1976). More to the point, the Court has explicitly recognized that "preserving party unity **during a primary** is not a compelling state interest." *Eu v. San Francisco County Democratic Cent. Committee*, 489 U.S. 214, 228 (1989) (emphasis added).

Still, the Court here assumes that state and party interests go hand in hand. *See ante*, at 19 (explaining that the state has "a legitimate interest in safeguarding parties from forced inclusion of unwanted members and candidates"). In doing so, the Court—improperly, in my view— transforms a claim of rights versus state interests into a claim of rights

versus rights, with the party leaders' rights coming out on top. *See* Persily, *supra*, at 2184.

Even if the state's interest did align with the party's right to exclude, that right, I conclude, does not justify the Affiliation Statute's burden on Rust.

### a. Giving Rust primary-ballot access doesn't impose his nomination on the Republican Party.

To begin with, the State Defendants' purported interest overlooks the fact that a political party's associational rights and interests do not begin and end with party leadership. *See Tashjian v. Republican Party*, 478 U.S. 208, 215 (1986) (noting that a "major state political party necessarily includes individuals playing a broad spectrum of roles in the organization's activities"). "At the stage of preprimary litigation," one commentator notes, "no one knows whether the bulk of the membership of the party wants the names of additional candidates to appear on the primary ballot." Persily, *supra*, at 2186. Indeed, the "precise question in the litigation is whether party members will even have the opportunity to express their candidate preferences." *Id.*

Simply put, giving Rust primary-ballot access doesn't impose his nomination the Republican Party. That's for the voters (*i.e.*, the party-in-the-electorate) to decide at the primary election itself. *See Anderson*, 460 U.S. at 803 (citing the "conclusive effect" of "the winnowing process performed by party members in the primary election"); *Eu*, 489 U.S. at 227 (citing the primary election as the proper means for "contending forces within the party" to ultimately "settle their differences") (internal quotation marks and citation omitted). To conclude otherwise allows the party leadership to "invoke the powers of the State to assure monolithic control over its own members and supporters." *Anderson*, 460 U.S. at 803.

### b. The Republican Party has never excluded Rust from membership.

The Court relies on *Hero* for the proposition that "a political party may **exclude** candidates from their ballot, even if they satisfy the Affiliation Statute." *Ante*, at 18. But that precedent weighs against the need for the Statute's two-primary requirement.

In *Hero*, a longtime member of the Republican Party, Joseph Hero, "openly campaigned for the defeat of a Republican candidate." 42 F.4th at 770. The State Republican Party "caught wind of Hero's efforts" and informed him that he was "not a Republican in good standing," thus "barring him from seeking elected office in Indiana as a Republican" for ten years. *Id.* at 770–71. Despite this bar, Hero declared his Republican candidacy for a seat on the town council. *Id.* at 771. The chairman of the county Republican party challenged Hero's candidacy. While conceding that "Hero met the qualifications for affiliation" under the statute, the chairman "maintained that Hero could not run based on 'an actual order from the party chairman in Indiana.'"[12] *Id.* The county election board agreed, as did the Seventh Circuit Court of Appeals, concluding that the restriction was reasonable and nondiscriminatory because the "State has an interest in protecting a party's right to determine its own membership and limit its candidates to those party members." *Id.* at 776.

Unlike in *Hero*, Rust has **not** been banned from the Republican party. To the contrary, the State Defendants have **repeatedly** emphasized that Rust could still run as a Republican (before the candidate-filing deadline) if the current chair of his county's Republic Party were to "change her mind" or if she were to "resign, die, or otherwise vacate the county party chair position" and leave certification discretion to her replacement. App. Vol. 2, p. 143; *see also id.* at 149–50; Tr. Vol. 2, p. 10. What's more, while arguing that Rust is disqualified under the Affiliation Statute, the State

---

[12] The statute in *Hero* was the pre-2022 version, requiring the candidate to have either voted for their party in the last primary election or to have secured certification from the county chairperson. 42 F.4th at 771.

Defendants expressly rejected the idea that "Rust is an unwanted person in the Republican Party." Tr. Vol. 2, p. 66. In fact, they acknowledged that the county Republican party would "welcome [Rust's] participation." App. Vol. 3, p. 2; *see also* App. Vol. 2, p. 146.

This distinction aside, the Court, in its analysis of *Hero*, makes much of the fact that "the **final** decision to remove Hero from the ballot was from a state actor—the Lake County Election Board, which enforced the party's First Amendment rights." *Ante*, at 18. But the election board was enforcing, not a statutory restriction on a person's candidacy but, rather, the **party's right to exclude** a person **no longer affiliated** with that party by its **own rules**.[13] *See* 42 F.4th at 776–77. And "disaffiliation," whether by internal party rules or laws defining which voters may participate in a primary, "is an absolute bar to candidacy." *Storer*, 415 U.S. at 737. This absolute bar, moreover, precludes the need to assess the totality of the election laws as they affect the candidate's constitutional rights. *Id.* Thus, the *Hero* court's discussion of alternative means to accessing the ballot was **entirely irrelevant** to that case's resolution. *See id.*

Because the parties always retain a First Amendment right to disassociate from any person and thereby block them from the ballot, enforcing the Affiliation Statute's two-primary barrier against Rust does not serve an essential function in protecting the parties' rights to limit their candidacies to members in good standing.

### c. Given its potential for arbitrary application, the certification option fails to mitigate the burden of the two-primary barrier.

Having failed to vote Republican at two consecutive primary elections, Rust's other option to access the primary ballot was to obtain membership

---

[13] In fact, the Lake County Election Board made this very point in its briefing before the Seventh Circuit, arguing that Hero sought "to create a Constitutional question by conflating the issue of party membership with the issue of access to the ballot." Br. of Defendant-Appellee, at *2, *Hero*, 42 F.4th 768, 2022 WL 510919.

certification from the county chairperson of the Republican party. *See* I.C. § 3-8-2-7(a)(4)(B). But because this option is entirely discretionary and potentially arbitrary, it provides no means to mitigate the burden on Rust.

The certification option permits the local "county chairman" of the party with which a candidate "claims affiliation" to certify "that the candidate is a member of the political party." *Id.* As the Court explains, this provision allows a party discretion to welcome a candidate who does not satisfy the two-primary requirement. *Ante*, at 22. Precisely because of the party's discretion, however, the provision does nothing to lessen the burden of the two-primary requirement on Rust. The provision calls for certification of party membership but leaves the term "member" undefined. It is unclear how Rust could ascertain whether he is a Republican Party member or not. Such a "'standardless'" statute does not protect Rust's First Amendment rights because it "'authorizes or encourages seriously discriminatory enforcement.'" *See F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)). Lacking any "explicit standards," the provision is "vague" and leaves Rust's rights subject to "resolution on an ad hoc and subjective basis." *See Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972). Indeed, any candidate who fails to curry the favor of party leadership has little chance of accessing the primary by way of membership certification.

I find support for this conclusion in *Duke v. Connell*, 790 F. Supp. 50 (D.R.I. 1992). In that case, a presidential hopeful—David Duke—sought to place his name on the Republican Party's primary-election ballot in Rhode Island. *Id.* at 51. By statute, the state allowed three methods for admitting a presidential candidate to the primary ballot: (1) an announcement by the secretary of state of any known "bona fide national candidates for presidential nominee," (2) a written request signed by the chairman of the state committee, and (3) a petition signed by at least 1,000 qualified party voters. *Id.* at 51–52. A "bona fide national candidate" was defined as a person who was "generally recognized nationally as a presidential contender within his [or her] respective party." *Id.* at 52 (quoting statute).

Following the recommendation of the State Republican Party Chair, the secretary of state announced President George H.W. Bush as "the only person who met the requirements of a bona fide national candidate." *Id.* Duke, for his part, had announced his candidacy via national television. But while the secretary of state knew of this announcement, she ultimately decided that he was not a bona fide national candidate. *Id.* While Duke could still have secured access to the ballot by submitting a petition of 1,000 qualified signatures, the limited timeframe in which to pursue that option (eight days) rendered it impractical. *Id.*

The United States District Court for the District of Rhode Island concluded that the statutory procedure was "not reasonably necessary to achieve the legitimate state interest of regulating ballot access." *Id.* at 53–54. In reaching this conclusion, the court identified three potentially fatal infirmities. First, the procedure lacked meaningful criteria in failing to specify by whom a candidate must be "generally recognized nationally." *Id.* at 54. Second, the procedure failed to identify "what a candidate must do in order to comply" with the requirement, leaving a candidate to "necessarily guess at its meaning." *Id.* Finally, the procedure improperly vested in the secretary of state the authority to "exercise unreviewable discretion" in determining a person's candidacy. *Id.* By basing this determination on the "disapproval of party leaders," the court reasoned, the secretary of state "failed to consider Duke's support among the populace, for whom the party leaders [did] not necessarily speak." *Id.* What's more, the court explained, the procedure set forth "no standards" for the state party chair to follow in making a recommendation, effectively permitting the chair to "discriminate against any candidate whose views he does not approve, even those of an incumbent, while acting under the guise of statutory mandate." *Id.* at 54–55.

Here, just as in *Connell*, the Affiliation Statute's certification option permits a county chair, unelected by Hoosier voters, "to discriminate against any candidate whose views [they do] not approve, even those of an incumbent, while acting under the guise of statutory mandate." *See id.* at 55. And given this potential for arbitrary application, it provides no means to mitigate the burden on Rust.

To be sure, a party may justifiably seek to prevent unsavory individuals like Duke (a former Klansman with extreme right-wing views) from becoming a candidate. But the Republican Party has taken no such steps with respect to Rust—a candidate who, unlike Duke, closely adheres to the "core beliefs" in the Republican Party platform. *See* App. Vol. 3, pp. 19–20.

## III. The Court's decision gives the legislature unrestricted authority to regulate the primary ballot.

The Court characterizes the foregoing analysis as expressing a policy preference. *Ante*, at 26. But it carries out exactly what the *Anderson/Burdick* test calls for: weighing "the character and magnitude" of the plaintiff's asserted constitutional injury against "the precise interests" offered by the state to justify the restriction **and** the "extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick*, 504 U.S. at 434. The Court, for its part, simply recites the State's asserted interests— avoiding voter confusion, ballot overcrowding, frivolous candidacies, and general "chaos" in Indiana's elections—with **no** analysis of how those purported interests are necessary to burden **Rust's** constitutional rights. *See ante*, at 21.

Today's opinion, in fact, would seem to discard the *Anderson/Burdick* test altogether, giving the legislature unrestricted authority to regulate the primary ballot any way it sees fit. *See id.* at 29 (declining to "second-guess the wisdom of the Affiliation Statute," which reflects "the expression of a majority of Hoosiers who are represented by legislators they elected who passed this law"). The concurrence goes a step further, suggesting that the General Assembly need not consider a potential candidate's voting history, allowing party leadership alone to establish party affiliation for ballot access. *Id.* at 17 (opinion of Molter, J.) (stating that, if "the party-controlled membership option is not unconstitutionally burdensome by itself," then there's "no need to go any further").

To be sure, I agree with the Court that "the legislature is in the best position to 'weigh the costs and benefits' of a given ballot restriction." *See id.* at 26 (opinion of the Court) (quoting *Crawford*, 553 U.S. at 181 (Scalia, J., concurring in the judgment)). But we are still "responsible for safeguarding against legislative overreach." *Horner v. Curry*, 125 N.E.3d 584, 610 (Ind. 2019) (Rush, C.J., concurring in part and dissenting in part). *See, e.g.*, *Holcomb v. Bray*, 187 N.E.3d 1268, 1273–74 (Ind. 2022) (holding unconstitutional a law that allowed the legislature to call itself into emergency session); *City of Hammond v. Herman & Kittle Properties, Inc.*, 119 N.E.3d 70, 73–74 (Ind. 2019) (declaring a statute that allowed certain cities to charge local landlords any amount to register rental properties to be unconstitutional special legislation). This is hardly a controversial proposition, even in the context of analyzing the constitutionality of the state's election scheme. As the Supreme Court of Appeals of West Virginia recognized, "the Legislature, **as well as the judiciary**, has a role to play in ensuring the process retains its integrity and functions as an accurate reflection of the people's will." *Billings*, 460 S.E.2d at 442 (footnote omitted, emphasis added). Indeed, the Court forsakes its role as a check and balance to the legislature if it "simply defer[s] to the General Assembly's decision on how to weigh the people's liberty." *Members of Medical Licensing Bd. of Indiana v. Planned Parenthood Great Nw., Haw., Ala., Ind., Ky., Inc.*, 211 N.E.3d 957, 990–91 (Ind. 2023) (Goff., J., concurring in part and dissenting in part).

# Conclusion

"A fundamental principle of our representative democracy," the U.S. Supreme Court once observed, quoting the words of Alexander Hamilton, "'is that the **people** should choose whom they please to govern them.'" *Powell v. McCormack*, 395 U.S. 486, 547 (1969) (quoting 2 Elliot's Debates 257) (emphasis added). And "this principle is undermined as much by limiting whom the people can select as by limiting the franchise itself." *Id.*

I couldn't agree more. And while the State has a legitimate interest in regulating the ballot—to avoid voter confusion or party raiding and to

preserve the parties' associational rights—those interests, in my view, fail to justify the onerous burden imposed on Rust.

For these reasons, I respectfully dissent from the decision of the Court to uphold the Affiliation Statute as applied to Rust.

Rush, C.J., joins.